**In re TAP, INCORPORATED, Debtor.**

**SHIPLEY COMPANY, INC., Plaintiff,**

**v.**

**Stephen B. DARR, Trustee, Defendant.**

**Bankruptcy No. 83–1754–HL.**

**Adv. P. No. 85–0027.**

United States Bankruptcy Court,
D. Massachusetts.

Aug. 16, 1985.

Louis M. Guenin, Boyd, MacCrellish & Wheeler, Boston, Mass., for plaintiff.

William R. Baldiga, Brown, Rudnick, Freed & Gesmer, Boston, Mass., for Stephen B. Darr, trustee of debtor's estate.

## MEMORANDA REGARDING CREDITOR'S COMPLAINT FOR RECLAMATION OF FUNDS

HAROLD LAVIEN, Bankruptcy Judge.

This matter was scheduled for trial on May 21, 1985. At that time, the parties stipulated to facts and all the relevant available evidence and the Court set a briefing schedule. After reviewing the stipulated facts and evidence, over a hundred-and forty-five pages of memoranda of counsels, and the applicable law, I make the following findings of fact and rulings of law.

For more than twenty years, the debtor, Tap, Incorporated, conducted a data processing business that provided customers with assistance in the processing of employee payrolls and the determination, reporting, and payment of federal and state payroll withholding taxes. The debtor, by 1983, had over seventy-five customers of which, the plaintiff, Shipley Company, Inc., was one. The typical service rendered to the plaintiff was at weekly intervals. The plaintiff reported to the debtor the number of hours worked by each employee of the plaintiff. With this information, and the employee's rate of compensation or salary already on file, the debtor calculated the amount of federal, state, and local withholding taxes for each employee, deducted the sum thereof from the employee's gross compensation, printed a check for the re-

sultant net compensation to each employee, and delivered the checks to the plaintiff. The debtor would also prepare for the plaintiff's signature the appropriate tax returns for reporting liability for such withholding taxes, and then advise the plaintiff of the aggregate amount of federal, state, and local taxes payable, as well as the fee payable to the debtor for such services for the applicable period. Upon receipt of such tax advice, the plaintiff would remit the total such sum to the debtor in immediately available funds by an interbank transfer from the plaintiff's bank, Shawmut Bank of Boston, N.A., to the debtor's bank, Coolidge Bank and Trust Company of Watertown, Massachusetts (the "Depositary"), for credit to the debtor's checking account No. 168300 (the "Former Account"). The Former Account was registered in the name of the debtor (doing business as "Package Payroll Plan"), without any identification of the Former Account as constituting customer funds. Each remittance by the plaintiff represented three items: a federal tax payment, a state tax payment, and a fee for the debtor's services. All the foregoing steps would be accomplished according to a regular timetable predicated on the customary day of the week (Thursday) for delivery of payroll checks by the plaintiff to its employees. The plaintiff's remittances in accordance with the foregoing procedure were consistently timely and, because they were made by interbank transfer, were received by the debtor in immediately available funds on the day on which the plaintiff initiated the interbank transfer.

The debtor would next deposit funds equal to the amount remitted by the plaintiff for federal taxes with the Depositary. Such deposits were customarily made by the debtor within three days of the date

(Thursday of each week) on which the plaintiff delivered its payroll checks to its employees, on the premise that such payment was required by law to be made within such time. (Internal Revenue Service Regulation § 31.6302[c]–1). This procedure was followed for 21 years. Since three days included a Saturday and Sunday, the funds passed through the debtor's hands almost instantly, as they would have to be transmitted to the Depositary Bank either the same day or the next day, Friday, unless, because of the weekend, payment could be delayed to the next banking day, namely, Monday.

In the case at bar, the plaintiff, on November 22, 1983,[1] remitted, by interbank transfer, the sum of $57,252.65 for credit to the account of the debtor with the Depositary. Of such transfer, $48,351.99 represented federal withholding and FICA taxes by the plaintiff. There were two additional deposits by unrelated customers on November 22, 1983; all three deposits totalled $74,146.52.

On the same day, November 22, the debtor was made aware of an embezzlement by one of its employees. In addition to terminating the employment of such employee, the debtor stopped payment on all outstanding checks drawn on the Former Account, established a new checking account (the "New Account"), and transferred, on November 23, $80,677.80 from the Former Account to the New Account. This transfer consisted of the three deposits (including the $57,252.65) made on November 22 and an unidentifiable balance of $6,531.28 that had existed in the Former Account the morning of November 22.[2] On November 24,[3] an adjustment in the amount transferred was made by returning $7,852.87—this consisted of the $6,531.28 unidentifiable

---

1. November 22, 1983 was a Tuesday. Thanksgiving was November 24, 1983.

2. The identification of the $57,252.65 within the transfer of monies from the Former Account to the New Account is manifested by the Depositary December 1, 1983 confirmatory letter, the debtor's ledger sheets, the debtor's copy of the November 22, 1983 bank statement and accom-

panying handwritten notes, and the three November 22 deposits plus the November 24 adjustment of $6,531.28 add neatly to the $80,-777.60 originally transferred. See discussion *infra*.

3. This is the stipulated date, but is probably incorrect since that was Thanksgiving.

balance and $1,321.28 for the amount of checks paid on November 22, 1983 that were not returnable. It should be noted that the Former Account, upon the debiting of checks prepared and posted but not paid and later reversed because of the stop-payment order, along with all deposits posted, appeared to have closing balances of –$113,192.57 on November 18, –$247,218.00 on November 21, and –$294,367.81 on November 22. However, on the reversal of these unpaid stop-payment checks, the actual true opening balance on November 22 was $6,531.28.

Despite the requirements of the three-day rule, on November 30, 1983, the debtor prepared and executed a check drawn on the New Account payable to the Depositary in the amount of the tax payment in question ($48,351.99), with the plaintiff's name printed in the upper left. Again, for an unexplained reason and despite the three-day requirement, not until December 5, 1983, was the check deposited, accompanied by federal Form 510, with the Depositary. The balance of the New Account was sufficient for payment of such check; indeed, there had been sufficient funds to cover the amount in question since the inception of the New Account.

The next day, December 6, 1983, the debtor, for no known reason, submitted a stop-payment order to the Depositary on the $48,351.99 check. The Depositary thereupon issued a "Memo of Check Returned," stamped the check in question "DO NOT REDEPOSIT," and credited the New Account with $48,351.99. On December 7, 1983; however, the Depositary remitted and the Federal Reserve Bank received payment of the tax payment. The Depositary made the appropriate charges against the New Account. On December 12, 1983, the debtor withdrew its stop-payment order on the check in question.

On or after December 12, 1985, the Depositary contacted the Federal Reserve Bank by telephone and in writing and re-quested from the Internal Revenue Service a refund of $48,351.99.[4] The refund request ascribed the sum to the plaintiff, identified by its taxpayer identification number. At the time of the refund request, no stop-payment order was then in effect. The check had cleared and the debtor's account had been debited. Nevertheless, in requesting the refund, the Depositary, with full knowledge to the contrary, represented that the check was uncollectible. On December 22, 1983, creditors of the debtor filed an Involuntary Petition in Bankruptcy. Throughout its processing of the refund request, the Federal Reserve Bank identified the tax payment with the plaintiff by name and taxpayer identification number. The requested refund was granted by the Internal Revenue Service on January 20, 1984, and remitted to the Depositary. The Depositary then sent to the trustee its Treasurer's Check No. 148614, payable to the debtor, on March 27, 1984. Subsequently, the trustee, at the request of the plaintiff, segregated such funds pending a judicial determination of entitlement thereto. Accordingly, the plaintiff filed a complaint for reclamation of the $48,351.00 tax payment.

For the plaintiff to recover upon Counts 1 and 2 of its complaint, two elements must be proven—one, that a trust or bailment relationship, either express or implied, existed, and, two, that the funds can be traced.

As to the first element, whether a trust relationship exists for the purposes of removing the alleged trust res from the pool of assets available for administration pursuant to the distribution scheme of the Bankruptcy Code, that is determined by reference to state, not federal, law. *In re Richmond Children's Center, Inc.*, 49 B.R. 262, 264–65 (Bankr.S.D.N.Y.1985); *Colletti v. Mass. Automatic Transmissions, Inc.*, 35 B.R. 328 (Bankr.D.Mass.1983). The Massachusetts' cases have consistently held that review of the circumstances are

**4.** According to the Trustee's Supplemental Memorandum, p. 8, dated July 15, 1985, the Depositary's request for a refund was made in ex-change for the debtor's cancellation of its stop-payment order.

relevant in determining the intent to create a trust—the fact that the word "trust" is not utilized is not determinative because "the existence of trust does not depend upon the terminology used" and may be implied from all of the relevant circumstances. *Gordon v. Gordon,* 332 Mass. 193, 195, 124 N.E.2d 226 (1955); *Herman v. Edington,* 331 Mass. 310, 314–15, 118 N.E.2d 865 (1954); *Rugo v. Rugo,* 325 Mass. 612, 616, 91 N.E.2d 826 (1950); *Levy v. Levy,* 309 Mass. 486, 489–90, 35 N.E.2d 659 (1941); *Sherwin v. Smith,* 282 Mass. 306, 311–312, 185 N.E. 17 (1933); *Robinson v. Cogswell,* 192 Mass. 79, 84, 78 N.E. 389 (1906); *Sawyer v. Cook,* 188 Mass. 163, 165, 74 N.E. 356 (1905); *Packard v. Old Colony Railroad,* 168 Mass. 92, 96, 46 N.E. 433 (1897). *See also,* Restatement (Second); of Trusts, § 24 (1957):

§ 24. Mode of Manifestation of Intention.

(1) Except as otherwise provided by statute, the manifestation of intention to create a trust may be made by written or spoken words or by conduct.

(2) No particular form of words or conduct is necessary for the manifestation of intention to create a trust.

Comment:

.   .   .   .   .

b. *Effect of circumstances on interpretation of words.* In the interpretation of the words and other conduct of the settlor, circumstances throwing light upon the settlor's intention are relevant, and evidence of such circumstances is admissible.... Acts prior to and subsequent to, as well as acts contemporaneous with the manifestation which it is claimed creates a trust, may be relevant in determining the settlor's intention to create a trust.

The most recent and definitive Massachusetts state court decision regarding an implied trust is *Carpenter v. Suffolk Franklin Savings Bank,* 362 Mass. 770, 291 N.E.2d 609 (1973):

Whether a trust was created depends upon the intention of the parties "manifested by their words and conduct and

the end to be accomplished." *Povey v. Colonial Beacon Oil Co.,* 294 Mass. 86, 90 [200 N.E. 891 (1936)]. The bill does not set forth the specific terms of the mortgage and loan agreements, and there is no allegation that the agreements contain the term "trust," but the fact that the word "trust" may not have been used is not determinative since "the existence of a trust does not depend upon the terminology used." *Gordon v. Gordon,* 332 Mass. 193, 195 [124 N.E.2d 226 (1955)]. *Robinson v. Cogswell,* 192 Mass. 79, 84 [78 N.E. 389]. *Rugo v. Rugo,* 325 Mass. 612, 616 [91 N.E.2d 826 (1950)].

It has been said that "[w]here the owner of property transfers it to another with a direction to transfer it to ... a third person, this may be a sufficient manifestation of an intention to create a trust." Scott, Trusts (3d ed.) § 24, at 192.

In *Andrew v. Union Sav. Bank & Trust Co.,* 220 Iowa 712, 715 [263 N.W. 495 (1935)], the court stated that when money was left with the bank for the payment of a debt to a designated person: "[T]he money does not become the property of the bank. The fund is merely intrusted to the bank as a trustee or bailee without any authority on the part of the bank to use it as its own."

The Court of Appeals for the Second Circuit has stated: "There are certain principles we regard as established: ... Every person who receives money to be paid to another, or to be applied to a particular purpose, to which he does not apply it, is a trustee, and may be used either at law for money had and received, or in equity as a trustee, for a breach of trust. *Taylor v. Benham,* 5 How. 233, 274, 12 L.Ed. 130 [(1847)]; *Kane v. Bloodgood,* 7 Johns. Ch. (N.Y.) 110, 11 Am. Dec. 417." *In re Interborough Consol. Corp.,* 288 Fed. 334, 347 (2d Cir. [1923]).

In *Hooper v. Mayo,* 298 Mass. 411 [10 N.E.2d 249 (1937)], the defendant agreed to hold the sum of $3,000 for the stated

purpose of protecting himself from any tax liability and other incidental expenses connected therewith. We held that "[t]he agreement created a fiduciary relation which entitled the plaintiff to an accounting in her bill in equity." P. 413 [10 N.E.2d 249].

*Carpenter v. Suffolk Franklin Savings Bank*, 362 Mass. 770 at 777–78, 291 N.E.2d 609. In the case at bar, if anything is clear, it is that the plaintiff, for twenty-one (21) years, paid money to the debtor for the express purpose of paying third parties. The delivery of funds by the plaintiff rested upon the clear understanding, typical of the debtor's relationship with customers, that the funds were to be remitted promptly to the appropriate taxing authorities. This arrangement was predicated upon the three-day period during which federal tax deposits must be remitted.[5] Internal Revenue Service Regulation § 31.6302[c]–1. There was no consent to the debtor's use of such funds for its own purposes, and the plaintiff relied upon the debtor's function as a transmitter of the funds and not on any expectation of the debtor's solvency. These expectations and circumstances, in existence for some twenty-one years, are sufficient for this Court to find that an express trust, as evidenced by the parties' conduct, existed as a matter of contractual relationship.

The trustee has noted, among other cases, *In re Morales Travel Agency*, 667 F.2d 1069 (1st Cir.1981). There, the debtor travel agency, upon the sale of airline tickets, became responsible for the price of the ticket. Further, under the contract between the debtor and the airline, whatever money the debtor, Morales, did collect "shall be the property of the Carrier and shall be held by the Agent in trust for the Carrier...." The Circuit Court held:

> Morales was left free to use what it received for its own benefit rather than Eastern's, and to transform the receipts into assets with no apparent encumbrance, upon which potential creditors might rely.

> . . . . .

> In the absence of any provision requiring Morales to hold the funds in trust by keeping them separate, and otherwise restricting their use, the label "trust" could in these circumstances and for present purposes have no legal effect. *See In re Penn. Central Transportation Co.*, 328 F.Supp. 1278 (E.D.Pa.1971); Scott on Trusts § 12.2 (3d ed.).

> Our conclusion is buttressed by other terms of the agreement. Morales' contractual responsibility to a carrier went beyond transmitting the funds actually received, to paying the price of tickets sold whether it received that amount or not. Morales, moreover, was required to transmit the proceeds not upon receipt, nor even upon demand, but at specified regular intervals. Thus for everyday purposes the relationship was the conventional one of debtor-creditor—the "trust" was a draftsman's concept, designed to rescue Eastern in a situation such as the present but otherwise to be ignored. (footnote omitted)

667 F.2d at 1071–72. However, in the case at bar, the debtor was held to a course of dealing defined by twenty-one years of business and was not free to use the money for its own benefit. There was no extension of credit. Further, plaintiff was not a creditor of the debtor. The defendant's only function was to transmit the funds entrusted to it *promptly*, within three days of receipt. This was not a situation like the *Morales* type cases where funds are collected from third parties and used at will by the defendant whose only responsibility is to pay when billed, or at some monthly or other non-immediate date, much the same as any other creditor. Here, the funds are not collected from third parties but are the plaintiff's funds in the exact amount of taxes as computed by the defendant to be paid, forthwith, to the Depos-

---

**5.** Indeed, because the plaintiff remitted tax payments on a Thursday, the third day at the outside, considering the weekend, would be Monday, calling for an almost instantaneous transfer.

itary for transmission to the taxing authorities. Although the comingling of funds is a factor, a Court, including this one, must weigh, its presence does not dictate the finding of an absence of a trust relationship. *See, e.g., In re Razorback Ready-Mix Concrete Co.*, 45 B.R. 917, 12 B.C.D. 356, 358–9, n. 4 (Bankr.E.D.Arkansas 1984); *In re Newark Shoe Stores, Inc.*, 3 F.Supp. 293 (D.Md.1933); Scott on Trusts § 12.2 (3d ed.). While the debtor only used a single bank account, it kept detailed log books of customer tax deposits, sufficient to preserve the identity of the plaintiff's monies and, for twenty-one years, had recognized its obligation to promptly transmit the same. Finally, the *Morales* Court reached its decision after consideration of these factors in the light of the "circumstances" presented. This Court, after consideration of all the circumstances, can only find that a trust relationship did exist so long as the res was intact and readily identifiable and traceable; this case fits snugly into the pattern of the *Carpenter* case decision.

■ As to the second issue, tracing the proceeds of the tax payments, determination of that issue must be found in favor of the plaintiff, also. The balance transferred to the New Account from the Former Account clearly encompassed the plaintiff's November 22 deposit—the opening balance on November 22 was $6,531.28,[6] and, only $1,321.28 worth of checks were cashed against it, only three deposits including plaintiff's $57,252.65 totaling $74,146.52 were added by day's end. Further, the Depositary's letter of December 1, 1983, in confirming the amount transferred stated that the debtor had "identified the payrolls in question," and that the transfer amount had then been corrected by "matching the actual wires and deposits of November 22, 1983" pursuant to the debtor's "request." The debtor's ledger sheet reconciliation also subdivided the sum of $80,777.60 among several customers, ascribing $57,-249.65 to the plaintiff. Moreover, the debtor's copy of the bank statement of the Former Account for November 22, 1983

includes handwriting next to the $57,249.65 deposit of "7/23/83 Transferred to new account Encompassed in $80,677.80." Finally, the $7,852.87 adjustment, with the exception of the $1,321.59 allowance for checks actually cashed can only be explained by accepting that the amount transferred to the New Account was comprised only of those sums deposited on November 22, 1983. The actual numbers are discussed earlier in this opinion.

Identification and tracing of the amounts in question to the New Account, however, does not end this Court's analysis:

A problem arises, however, where the trust funds have been traced into a general bank account of the Debtor. Under these circumstances:

... the bankruptcy court will follow the trust fund and decree restitution where the amount of the deposit has at all times since the intermingling of the funds equaled or exceeded the amount of the trust fund. But where, after appropriation and mingling, all of the moneys are withdrawn, the equity of the cestui is lost, although monies from other sources are subsequently deposited in the same account. *In the intermediate case where the account is reduced to a smaller sum than the trust fund, the latter must be regarded as dissipated, except as to the balance, and funds subsequently added from other sources cannot be subjected to the equitable claim of the cestui que trust.* If new money is deposited before the balance is reduced, the reduction should be considered to be from the new money and not from the monies held in trust. This analysis may be referred to as the lowest intermediate balance test.

4 *Colliers on Bankruptcy*, ¶ 541.13 (15th ed. 1983).

*In re Felton's Foodway, Inc.*, 49 B.R. 106, 108 (Bankr.M.D.Fla.1985).

---

**6.** This balance, of course, does not include charges for checks executed and posted, yet not actually cashed, and whose debits were reversed as a result of the stop-payment.

In the case at bar, the $80,677.80 originally transferred to the New Account from the Former Account was adjusted on November 24, by returning $6,531.28—the opening balance on November 22—and $1,321.59—checks that were not returned despite the stop-payment order—to the Former Account. These two adjustments presumably reduce the transferred amount to $72,824.93 and may affect the amount recoverable by the plaintiff, as one possibly could interpret the entire $74,146.52 as held in trust and, subsequently, reduced by the $1,321.59 adjustment. The plaintiff has argued that the inclusion of the $1,321.59 in the adjustment appears to be mistaken, as it should be included in the determination of the $6,531.28.[7] Further, the plaintiff argues that the $1,321.59 is most logically attributed to the portion of the plaintiff's $57,252.65 remittance above the $48,351.99 in question here, since that included non-trust funds that belonged to the defendant as its fee. The Court, however, need not weigh these arguments. The overwhelming fact is that by November 24, the debtor had received sufficient deposits to place the New Account's balance far in excess of the $74,146.52 that may be in question here. Further, from November 23 to December 7 (the date the Depositary transferred the $48,351.99 to the Federal Reserve Bank as payment of plaintiff's taxes), the New Account remained in excess of the $74,146.52 as the result of subsequent deposits.[8]

■ The trustee has argued that the funds are not traceable because the Former Account had a "provisional" opening balance of *negative* $247,218.89. The Court has already found against this contention, pointing out that this negative figure was a mere temporary bookkeeping entry later revised when payment on all those checks was stopped. The debtor was not charged with those checks, the bank did not pay them, no claim is made for them by the bank. But, further, if there was any reality to this negative balance, there would have been no $80,677.80 to transfer to the New Account.

Finally, this finding is buttressed by the actions of both the Depositary and the trustee following the December 9th transfer. On January 20, 1984, the Federal Reserve Bank remitted to the Depositary a $48,-351.99 check because the Depositary had represented that the deposit check in question was uncollectible because of insufficient funds. However, upon return, the Depositary transferred the refund to the trustee on behalf of the debtor. If, indeed, the account had been insolvent and the check uncollectible because of insufficient funds, the money would belong not to the debtor whose check was no good, but to the Depositary who would have, by logical extension, used its own funds to pay the Internal Revenue Service. Accordingly, I find these funds are not part of the estate and the plaintiff is entitled to the return of the amount in question as its trust funds.

Because I find that by implication and from circumstances clearly showing that the debtor was a mere conduit for payment of taxes and, therefore, a trust existed between the plaintiff and the debtor, for purposes of the return of the tax payment to the plaintiff, I need not discuss the other counts regarding a constructive trust, bailments, or fraud. However, since the Court asked the parties to specifically brief one additional aspect, the Court feels constrained to discuss that issue.

That issue raised primarily in Count 3 concerns the obvious misrepresentation of the Depositary Bank to the Federal Reserve Bank and Internal Revenue Service, of payment having been made by a check based on insufficient funds. Can the debtor—now the trustee—claim the refund,

---

7. More fully explained, because the $1,321.28 adjustment is the result of the checks cashed despite the stop-payment order and the $74,-146.52 was transferred after the stop-payment orders were placed, the checks cashed should be charged against the balance existing prior to the deposit of $74,146.52—here $6,531.28.

8. Of course, there were subsequent checks paid against the New Account. But, the excess of deposits over withdrawals kept an amount in excess of $74,146.52 in the account at all times relevant.

based on what amount, to a fraudulent statement? After all, the bank certainly knew that at all times there was in fact sufficient funds in the debtor's account to honor the check.

■ Property obtained by fraud of the debtor or of another is not part of the debtor's estate. *See Nicklaus v. Bank of Russellville*, 336 F.2d 144, 146–147 (8th Cir.1964); *In re Teltronics, Ltd.*, 649 F.2d 1236, 1239 (7th Cir.1981); *cf. 4 Collier on Bankruptcy*, ¶ 541.13 (15th ed. 1983). The debtor acquired possession of the refund because the Depositary requested and received it from the Internal Revenue Service. The debtor, after, belatedly, forwarding the plaintiff's money to the Depositary Bank, sought to stop payment of the original $48,351.99 check. While such attempt was ultimately unsuccessful when the Depositary debited the amount to its account, that did not effect the Internal Revenue Service or the plaintiff. The debtor's recourse, if any, was against the Bank. Instead, the debtor withdrew the stop-payment order and engaged in its skirmish with the Bank in order to recover the payment made to the Internal Revenue Service through the Federal Reserve Bank.

The procedure of the Treasury Tax and Loan Account system is critical. Once sent, a federal tax deposit is beyond the control of the taxpayer, his agent, and the Depositary Bank. 31 C.F.R. 214.7[c]. The only available means to recover funds is through a request for reversal action:

A FRB [Federal Reserve Bank] should initiate a request for an adjustment to an individual taxpayer's account *if the depositary has provided* to the FRB proof that the taxpayer's remittance item was uncollectible, or *if the depositary reports* that the documentation provided to the IRS by the depositary shows an amount other than what the taxpayer actually paid. That is, the amount on the FDT [i.e., federal tax deposit] coupon and the amount of the taxpayer's check were different. Requests made to FRB's directly by third parties in FDT transactions, such as taxpayer service firms, to adjust a taxpayer's record at IRS should not be processed. (emphasis added)

Treasury Tax and Loan Release No. 80, Department of the Treasury, May 31, 1984, p. 1, emphasis in original.

■ It is well established under Massachusetts law that "if one makes as of his own knowledge a false statement respecting a material fact which is susceptible of knowledge, he has committed an actionable fraud on another who with right has relied upon it to his damage, even though the maker of the statement did not know it to be false." *Chatham Furnace Co. v. Moffatt*, 147 Mass. 403, 404, 18 N.E. 168, 169 (1888); *see also Yorke v. Taylor*, 332 Mass. 368, 124 N.E.2d 912, 916 (1955); *Moran v. Levin*, 318 Mass. 770, 64 N.E.2d 360, 362 (1945); and *Howard v. Barnstable County National Bank of Hyannis*, 291 Mass. 131, 136, 197 N.E. 40 (1935). The Depositary's actions constituted fraud because the Depositary stated in its refund request that the $48,351.99 check was uncollectible. Such statement was clearly false—on December 5, 1983, the date the Depositary first processed the $48,351.99 check, the New Account had a balance of $562,970.22. On December 9, 1983, the date of the actual remittance to the Federal Reserve Bank, the New Account had a balance of $614,797.73. As the drawee, the Depositary could hardly contend that the check in question was uncollectible. Further, the Depositary, as proof of uncollectibility, provided a copy of a then collected check stamped "PAYMENT STOPPED" and "DO NOT REDEPOSIT" when the stop-payment order had been withdrawn, earlier.

The debtor's and trustee's role in this aspect are open to question. The trustee's third-party complaint alleges that the Depositary's request for a refund was done without the assent or authority of the debtor. The stipulation does not state definitively that the debtor had any role in the refund request of the Depositary. The stop order, itself, carries the handwritten notation: "this S/P cancelled on 12/12 per

meeting with Bill & Sharon [of Coolidge Bank]." The depositions provided to the Court do not provide any definitive answer, either. Curiously, however, the Plaintiff's Supplemental Memorandum of July 5, 1985 notes:

> Three days later, on December 12, 1983, the Debtor cancelled the stop payment order in exchange for Coolidge's commitment to obtain a refund of the remitted Tax Payment.

*See* as to evidentiary effect of statement by counsel. *Milano v. Hingham Sportswear Co.*, 366 Mass. 376, 379, 318 N.E.2d 827 (1974); *Romero Reyes v. Marine Enterprises, Inc.*, 494 F.2d 866, 868–9 (1st Cir. 1974); *Hake v. George Wiedemann Brewing Co.*, 262 N.E.2d 703, 706, 23 Ohio St.2d 65 (1970).

With this admission, what had been surmised from the surrounding circumstances becomes clear. Although the appropriateness of the debtor's stop-payment order of December 6 may have been in doubt, the Bank, fearing liability for not honoring it, entered into a deal with the debtor. The debtor would withdraw the stop-payment order and the Bank would get a refund from the Internal Revenue Service by virtue of its mendacious statements to the Federal Reserve Bank and the Internal Revenue Service.

These funds, recovered from the Internal Revenue Service as a result of the Bank's misrepresentation, cannot remain with the Bank who, in fact, does not claim them, and certainly, do not belong to the debtor who cannot benefit from the Bank's misrepresentations with which, from the admissions in its brief, it was a participant. On these facts, these funds should be returned in the first instance, to the Internal Revenue Service; however, since the government's original claim to the funds was based on the plaintiff's taxes which it has now paid and therefore paid twice, these funds should, as a matter of substance over form be returned to the plaintiff, even if there was no original trust.