In re UDI CORPORATION, Debtor.

Gary Weiner, Chapter 7
Trustee, Plaintiff,

v.

A.G. Minzer Supply Corp.,
et al., Defendants.

Bankruptcy No. 99–43232–HJB.
Adversary No. 01–4092.

United States Bankruptcy Court,
D. Massachusetts.

Nov. 6, 2003.

Mark Bluver, Steven Weiss, Shatz, Schwartz & Fentin, Springfield, MA, for Gary Weiner, Chapter 7 Trustee.

Rosemary Macero, Alison Blew, Macero & Associates, Boston, MA, for SOS Office Supply.

Steven Meuneir, Office of the U.S. Trustee, Worcester, MA, U.S. Trustee.

### MEMORANDUM OF DECISION

HENRY J. BOROFF, Bankruptcy Judge.

Before the Court is a "Complaint to Avoid and Recover Preferential Transfers" (the "Complaint") filed by Gary Weiner (the "Trustee"), as trustee in bankruptcy of UDI Corporation (the "Debtor" or "UDI"), against various parties seeking to recover, pursuant to 11 U.S.C. §§ 547(b) and 550, alleged preferential transfers (the "Transfers") made to the Defendants of approximately $186,000.00. In their joint answer, the Defendants raise various defenses, including that the Transfers never constituted estate property. Instead, they assert the Transfers represented rebates which the Defendants earned from a third party and which merely passed through their agent, the Debtor, as a conduit, to them.

I. *FACTS AND TRAVEL OF THE CASE*

On May 13, 1999, an involuntary petition for relief under Chapter 7 of the Bank-

ruptcy Code (the "Code") was filed against the Debtor in this Court. An Order for Relief entered shortly thereafter.

Prior to the petition date, UDI was a wholly owned subsidiary of Office Center Corporation ("OCC") and operated as a buyer of wholesale office products. The Debtor's business was to negotiate discount prices for office products with manufacturers and wholesalers on behalf of its members (the "Members"), who were thus joined as a "buying group." The Defendants, re-sellers and retail distributors of office products, were all Members of the Debtor's buying group. The Transfers at issue represented rebates from one of UDI's wholesalers, the S.P. Richards Company, which were sent to UDI for disbursal to eligible Members.

At all relevant times, including the period during which the Transfers occurred, written contracts (the "Membership Agreements") governed the relationship between UDI and the Members.[1] In the Membership Agreements, the Members and UDI stated their mutual intent to "organize a 'buying pool' (the 'Pool') in order to obtain discount prices from manufacturers, distributors and wholesalers." The recitals called for UDI to "act as the Pool's exclusive agent in negotiating contracts with manufacturers and wholesalers for the purchase of office products upon prices, discounts, terms and conditions favorable to the Members." To join, Members had to meet minimum purchase and creditworthiness requirements, put in place credit insurance or a letter of credit

equal to their anticipated monthly purchase amounts, pay various fees, and agree to abide by certain standards established by a majority vote of the Members. In some cases, Members paid an initial fee, an annual fee, and an "Initial Retainage" equal to fifty percent (50%) of the Member's first year monthly volume discount received from two of the Pool's wholesalers/manufacturers.[2] In all cases, a Member would pay a fee equal to one percent (1%) of its monthly invoices. Under the Membership Agreement, a payment default entitled UDI to draw down on the Member's credit insurance or letter of credit to satisfy the invoice.

Under the Membership Agreement, certain aspects of UDI's management of the Pool, including the negotiation of "Preferred Buy Agreements" with designated suppliers, were contingent upon the prior approval of at least sixty percent (60%) of the Members. In exchange for this control over the operation of the Pool, Members agreed to satisfy their purchasing needs as much as possible from product lines available under the Preferred Buy Agreements. Members would place an order directly with a supplier, designating that they were a Member of UDI's Pool. Among other reasons, such designation was necessary for calculating a Member's eligibility to participate in year-end rebate programs offered by certain suppliers.

Under separate agreements coordinated by UDI, Members could become eligible for year-end rebates based upon annual

1. A.G. Minzer is captioned as lead Defendant solely out of administrative convenience; it is, alphabetically, the first Defendant. The parties stipulated that this be a jointly administered adversary proceeding and that one of the Defendants serve as a "test case" to resolve the issues common to all Defendants. SOS Office Supply ("SOS") was chosen. Consequently, the Membership Agreement of

SOS was admitted at trial, and SOS's president David Shapiro ("Shapiro") was the only trial witness.

2. Those two companies were United Stationers and S.P. Richards Company ("SP Richards"). As stated previously, the Transfers comprised a rebate sent to UDI from S.P. Richards in March, 1999.

purchasing levels. The "UDI–I Fee Structure" explained that: "UDI remits the year-end wholesaler rebate back to the member." In the case of S.P. Richards, Members earned rebates when their annual purchases met pre-set levels established under an annually renewed contract undersigned by an officer of the Member, S.P. Richards, and UDI. In order to qualify for the rebates, the Pool was required to meet certain established benchmarks. For example, if the Pool collectively made ten million dollars of qualified purchases from S.P. Richards, it would be eligible for a one percent (1%) rebate; if the Pool collectively made 20 million dollars of qualified purchases, the rebate was two percent (2%), and so on up to a pre-set cap. SOS's president, David Shapiro ("Shapiro"), testified that the contract underlying the Transfers was representative of rebate contracts from prior years. That contract called for the rebate to be paid in February, 1999 based upon qualifying purchases made in the 1998 calendar year.

UDI's credit manager Lisa Demery ("Demery"), in her deposition that was admitted into evidence, testified that UDI received the S.P. Richards aggregate rebate check by March each year for disbursal to the qualifying Members; UDI received the check for calendar year 1998 on March 11, 1999. Typically, the check was accompanied by documentation from S.P. Richards indicating the amounts due each Member. Upon receipt, UDI deposited the rebate check into a local account; the company "lock box account" was reserved for invoice payments.[3] Demery stated that during the period between receipt and disbursal, UDI extracted a fee from the aggregate amount, created spreadsheets confirming the amount owed to each Member, and prepared and mailed the checks.[4] UDI disbursed the rebate checks to the Members between March 15–22, 1999.[5] Shapiro testified that the manner and time frame in which SOS received the 1999 S.P. Richards rebate from UDI was the same as SOS's receipt of the rebate in previous years. Shapiro stated that he had no knowledge of the one percent (1%) fee that UDI took from the rebate, stating he had always assumed that he was receiving one-hundred percent (100%) of the rebate. The underlying contract between SOS, UDI, and S.P. Richards makes no mention of a fee to be paid to UDI from the rebate amount. In fact, nothing in the record indicates that any Members intended for UDI to take a fee from the rebates.

In 1997 and 1998, OCC and the Debtor sought to complete an initial public offering ("IPO"). However, by the end of the summer of 1998, the IPO efforts had failed. The costs associated with the IPO effort exceeded $10,000,000.00 and had been financed through a line of credit with First Union National Bank. By late 1998,

---

**3.** Demery described the local account as a "special separate account" for "odds and ends checks, rebate checks, checks that came directly into the office" in Springfield, Massachusetts. The lock box account, located at a P.O. Box in Pennsylvania, was strictly for accounts receivable.

**4.** Demery referred to her role in the period between UDI's receipt of the rebate check and the disbursement to the Members as performing "due diligence."

**5.** UDI sent rebate checks to the various Defendants on March 15, 1999, March 17, 1999, and March 22, 1999. UDI sent SOS's check on March 22, 1999. According to testimony, the rebates from S.P. Richards for calendar years 1995, 1996, and 1997 were all sent to UDI and forwarded to Members under essentially the same conditions and time frames as the rebate at issue for the 1998 calendar year. Inexplicably, though, one of the Defendants, Great Midwest Office Specialties, was sent its rebate check on February 19, 1999.

the Debtor was in default with its loan obligations to First Union, and it was falling in arrears with its trade creditors and suppliers. By early 1999, an informal unsecured creditors committee had been established to attempt to negotiate terms for repayment of the Debtor's substantial trade debt. Several trial exhibits indicated that the Debtor's dire financial situation was widely known in the industry and to the Members. In fact, UDI sent several communiques to its Members addressing its financial viability including one declaring, inter alia, that the rebate checks for calendar year 1998 would be sent out per usual despite "rumors circulating in the industry that have not been favorable to us." Demery testified that unlike in prior years, when Members would call merely to inquire about the timing of the rebate, in 1999, Members' calls regarding rebates were often angry and even threatening. Shapiro testified that he made no inquiries beyond those he would typically make regarding the rebates. Further, he stated that at no time did he receive any special treatment regarding the Transfers. SOS was, however, one of only seven (7) Members out of roughly 1100 that UDI invited to become original participants in the IPO.

## II. POSITIONS OF THE PARTIES

The Trustee complains that the rebates represent preferential transfers and seeks to avoid them under 11 U.S.C. § 547(b)[6] and recover them for the benefit of the estate pursuant to 11 U.S.C. § 550(a).[7] In support of this contention, the Trustee asserts that the Transfers constitute voidable preferences under § 547(b). He states that the Defendants were creditors with claims antecedent to the Transfers, and the Transfers represent payments to satisfy those antecedent debts. In addition, the Transfers occurred during the ninety (90) days prior to the commencement date and while the Debtor was insolvent. The Trustee argues that, since the Defendants all received one-hundred percent (100%) payment on their claims, they received more than if the Transfers had not been made and their claims allowed in the bankruptcy case.

The Defendants respond that the Transfers were never property of the estate as defined under § 541 of the Code,[8] and,

---

**6.** 11 U.S.C. § 547(b) reads in relevant part:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
 (1) to or for the benefit of a creditor;
 (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
 (3) made while the debtor was insolvent;
 (4) made—
 (A) on or within 90 days before the date of the filing of the petition;
 . . .
 (5) that enables such creditor to receive more than such creditor would receive if—
 (A) the case were a case under chapter 7 of this title;
 (B) the transfer had not been made; and

 (C) such creditor received payment of such debt to the extent provided by the provisions of this title.
11 U.S.C. § 547(b) (2003).

**7.** 11 U.S.C. § 550(a) reads in relevant part, "[e]xcept as otherwise provided in this section, to the extent that a transfer is avoided under section . . . 547 . . . of this title, the trustee may recover, for the benefit of the estate, the property transferred . . . ." 11 U.S.C. § 550(a) (2003).

**8.** In pertinent part, 11 U.S.C. § 541 describes property of the estate thusly:

a) The commencement of a case . . . creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:
 1) Except as provided in subsections (b) and (c)(2) of this section, all legal and

regarding the Transfers, the Defendants were never creditors with claims against the estate. They contend that the Transfers represented rebates they earned from, and were owed by, S.P. Richards; UDI acted merely as an intermediary, a pass-through to process the rebates. The Defendants argue that their relationship with UDI is best understood as "that of agent-principal and trustee-beneficiary." The Defendants point to the terms of the Membership Agreement establishing the Debtor as their agent in the "negotiation of discount prices from wholesalers and to obtain discounts and other terms and conditions favorable to the" Defendants. Acknowledging the scope of the agency as the crux of the matter, the Defendants rely on such broad terminology as proof that the agency extended to and "included the contract with S.P. Richards which sets forth the rebate terms." The Defendants claim that since the Debtor negotiated the agreement with S.P. Richards, the language of which provides for payment of rebates to the Members, the agency extended to the Transfers by virtue of the negotiation.

The Defendants go on to reason that the existence of the agency relationship led to certain fiduciary duties owed by the Debtor to the Defendants. The Debtor, they say, was duty bound to hold all funds generated by the agency relationship, including the Transfers, in trust for the ben-

eficiaries (i.e., the Defendants). As such, any unauthorized use by UDI of the rebate funds (i.e., commingling the funds, or extracting an unauthorized fee) represented conversion, surely subjecting the Debtor to an accounting and liability for the funds. However, such unauthorized use would not result in vitiation of the trust relationship and the identification of the Transfers as the proceeds of the rebates.

The Trustee responds that any agency relationship between UDI and the Members did not, on its terms, extend to the Transfers. Therefore, because the Transfers were outside the agency's scope, the Debtor owed the Defendants no fiduciary duty with regard thereto. Hence, the Transfers could not be characterized as having been held in trust by the Debtor on behalf of the Defendants. The Trustee urges the Court to this conclusion by pointing out that the Membership Agreements fail to mention the rebates, the proportionate share of a rebate to which a Member would be entitled, or any restriction on the Debtor regarding the use or commingling of the funds upon receipt of the rebate check from S.P. Richards.

Finally, the Defendants argue that if the Transfers are determined to be property of the estate under § 541, they were made in the ordinary course of the business of the Debtor to the Members and, as such, the provisions of 11 U.S.C. § 547(c)(2)[9]

---

equitable interests of the debtor in property as of the commencement of the case.
. . .
b) Property of the estate does not include—
1) any power that the debtor may exercise solely for the benefit of an entity other than the debtor
. . .
d) Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest ... becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such

property, but not to the extent of any equitable interest in such property that the debtor does not hold.
11 U.S.C. § 541 (2003).

9. 11 U.S.C. § 547(c)(2) states the trustee may not avoid a transfer under § 547:

2) to the extent that such transfer was—
A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

provide a defense to their recovery. Regarding the so-called subjective prong of the test under § 547(c)(2), the Defendants argue that the Transfers represented rebates they earned from S.P. Richards unmodulated by UDI's slide into bankruptcy. As it had in each of the four prior years, S.P. Richards sent the rebate check to UDI for disbursal in late February to early March, and it was disbursed to the Members shortly thereafter. The Defendants argue that the manner of payment was indistinguishable from that of prior years. The Defendants further maintain that the objective prong of the § 547(c)(2) test is satisfied because nothing in the record indicates that the Transfer to SOS differed in any way from the rebates paid to any of the other eligible Members; the industry norm was employed for all the Defendants regarding the payments from UDI.

The Trustee counters that the Defendants failed to provide evidence under either the subjective or objective prongs of § 547(c)(2) to support an ordinary course defense: 1) the Defendants failed to prove that the Transfers represented ordinary course payments between themselves and the Debtor; and 2) the Defendants failed to demonstrate that the Transfers were made in a manner that comported with industry norms. The Trustee notes that the Debtor's dire financial situation was widely known to the Members in the spring of 1999. Far from being ordinary, the Trustee contends that the Transfers were an inducement, part of a concerted effort by the Debtor's new management team to prevent its Members from withdrawing from the Pool as it slid into bankruptcy.

B) made in the ordinary course of business or financial affairs of the debtor and transferee; and

## III. DISCUSSION

### A. Property of the Estate under 11 U.S.C. § 541.

Upon the commencement of a bankruptcy case, an estate is created comprised of "all legal or equitable interests of the debtor ... wherever located and by whomever held." 11 U.S.C. § 541(a) (2003). In *United States v. Whiting Pools,* the Supreme Court determined the scope of § 541(a) to be broad. 462 U.S. 198, 204, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983). However, § 541(d) operates to limit the extent of the estate's interest in property in which the debtor holds "only legal title and not an equitable interest;" such property belongs to the estate "only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold." U.S.C. § 541(d) (2003). Plain language found in both the House and Senate reports that accompanied passage of the Code strongly supports the exclusion of property from the estate where the debtor is only a delivery vehicle lacking any equitable interest in the property delivered:

[s]ituations occasionally arise where property ostensibly belonging to the debtor will actually not be property of the debtor, but will be held in trust for another. For example, if the debtor has incurred medical bills that were covered by insurance, and the insurance company had sent payment of the bills to the debtor before the debtor had paid the bill for which the payment was reimbursement, the payment would actually be held in a constructive trust for the person to whom the bill was owed.

C) made according to ordinary business terms.

11 U.S.C. § 547(c)(2) (2003).

*Senate Rep. No. 95–989 (1978)*, at 82, reprinted in 1978 U.S.C.C.A.N. 5787, 5868; *H.R.Rep. No. 95–595 (1978)* at 368, reprinted in 1978 U.S.C.C.A.N. 5963, 6324. *See United States v. Yellin (In re Weinstein)*, 272 F.3d 39, 43 (1st Cir.2001) (supporting plain text interpretation of the Code through legislative history).

 The nature and extent of the debtor's interest in property is determined by applicable non-bankruptcy law. *Butner v. United States*, 440 U.S. 48, 54–55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *Crysen/Montenay Energy Co. v. Esselen Associates, Inc. (In re Crysen/Montenay Energy Co.)*, 902 F.2d 1098, 1101 (2nd Cir.1990). "It is necessary to examine whether the debtor owns the property absolutely, conditionally, or merely through some lesser relationship, such as a bailment, agency, or consignment, whereby the goods [or funds] actually belong, save for the debtor's right to possession, completely to another." *In re Lan Tamers, Inc.*, 281 B.R. 782, 789 (Bankr.D.Mass.2002) (quoting 5 Collier on Bankruptcy (MB) ¶ 541.06[1][a] (15th rev. ed.2001)). It is axiomatic that property held in trust by the Debtor on behalf of another is not property of the estate. *Mitsui Mfrs. Bank v. Unicom Computer Corp. (In re Unicom Computer Corp.)*, 13 F.3d 321, 324 (9th Cir.1994); *Connecticut General Life Ins. Co. v. Universal Ins. Co.*, 838 F.2d 612, 619 (1st Cir.1988).

In the so-called "true conduit" cases, courts have held that property merely passing through the debtor is not property of the estate, that the Debtor "arguably never acquires either 'bare legal' or equitable title, but simply a 'possessory' interest." Robert J. Keach, *The Continued Unsettled State of Constructive Trusts in Bankruptcy: Of Butner, Federal Interests and the Need for Uniformity*, 103 Comm. L.J. 411, 449, n. 172 (1998); *Compare Official Comm. of Unsecured Creditors v. Co-*

*lumbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 997 F.2d 1039, 1056 (3rd Cir.1993) (holding that refunds collected were held by debtor in trust solely to pay customers); *Pennsylvania Power & Light Co. v. Globe Store Acquisition Co. (In re Globe Store Acquisition)*, 178 B.R. 400, 403–405 (Bankr.M.D.Pa.1995) (holding that payments by customers of utility bills at Debtor's store were held in trust for the utility owing to customers' intent that the monies go to the utility); *Branch v. Hill, Holliday, Connors, Cosmopoulos, Inc. Advertising (In re Bank of New England Corp.)*, 165 B.R. 972, 977 (Bankr.D.Mass. 1994) (holding that where the parent company had collected funds from subsidiaries in advertising account and paid ad firm; "a straight pass-through of the funds" occurred); *with Foothill Capital Corp. v. Clare's Food Market (In re Coupon Clearing Serv., Inc.)*, 113 F.3d 1091, 1099 (9th Cir.1997) (holding that retailers' lack of control over debtor coupled with debtor's fund commingling prevented the court from excluding funds from estate property under theories of agency or trust).

 Generally, state law is the "applicable" law relied upon to make determinations of ownership interests; "[p]roperty interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently [under the Code]." *Butner*, 440 U.S. at 55, 99 S.Ct. 914. There is nothing before the Court indicating that a federal interest is implicated. *See In re Lan Tamers, Inc.*, 329 F.3d 204, 211–212 (1st Cir.2003) (holding that a federal interest may supercede other rights to funds held by a debtor that were generated via a federal program after examination of the program's regulations and the nature of the "grantor-grantee relationship"). Therefore, the Court turns to a

brief discussion of the Massachusetts laws of agency and trusts in order to properly characterize the property interests in the Transfers.

Under Massachusetts law, "an agency relationship is created when there is mutual consent, express or implied, that the agent is to act on behalf or for the benefit of the principal, and subject to the principal's control." *Theos & Sons, Inc. v. Mack Trucks, Inc.*, 431 Mass. 736, 742, 729 N.E.2d 1113, 1119 (2000); *see Kirkpatrick v. Boston Mut. Life Ins. Co.*, 393 Mass. 640, 645, 473 N.E.2d 173, 176 (1985) (holding that an agency relationship "results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control") (quoting *Restatement 2d of Agency § 1* (2002)); *Patterson v. Barnes*, 317 Mass. 721, 723, 60 N.E.2d 82 (1945) (holding the cardinal aspect of an agency relationship to be that an agent act on behalf of the principal). A signature consequence of the creation of an agency relationship is the emergence of fiduciary duties owed by the agent to the principal. *Gagnon v. Coombs*, 39 Mass.App.Ct. 144, 154, 654 N.E.2d 54, 60 (1995) (stating that an agency relationship has one "supreme characteristic," that the agent stands in fiduciary relation to the principal on all matters within the scope of the agency). One of those fiduciary duties is to return to the principal all proceeds generated through the scope of the agency. *Mackey v. Rootes Motors, Inc.*, 348 Mass. 464, 466, 204 N.E.2d 436, 439 (1965) *citing Restatement 2d of Agency § 388* (2002); *Jerlyn Yacht Sales, Inc. v. Roman Yacht Brokerage*, 950 F.2d 60, 67 (1st Cir.1991).

In the instant case, UDI and the Defendants were signatories to Membership Agreements that provided, inter alia, that UDI would "act as the Pool's exclusive agent in negotiating contracts with manufacturers and wholesalers for the purchase of office products upon prices, discounts, terms and conditions favorable to the Members." Moreover, the Members retained control over UDI's power to set standards for new Members and negotiate certain buying agreements. Given those facts, the parties manifested their consent for UDI to act as the Defendants' agent. For its part, SOS agreed to become a Member of UDI to achieve, among other things, higher discounts and become eligible for rebates. Since both parties intended for and signed agreements that called for UDI to negotiate as agent, inter alia, discount and rebate arrangements on its behalf, the rebates earned under those arrangements, including the S.P. Richards rebates, were within the agency's scope.

Identification of an agency relationship between UDI and the Defendants and determining its scope, however, does not completely answer the question of how to characterize the litigants' interests in the Transfers. To that end, the Court looks to Massachusetts trust law. According to the Restatement of Trusts:

> [a] resulting trust arises where a person makes or causes to be made a disposition of property under circumstances which raise an inference that he does not intend that the person taking or holding the property should have the beneficial interest therein, unless the inference is rebutted or the beneficial interest is otherwise effectively disposed of.

*Restatement (Second) of Trusts § 404* (2003). Typically, a resulting trust arises in instances where one furnishing the consideration for real property places legal title to the property in the name of another while intending that the one furnishing the consideration be the true, equitable owner. *Checovich v. Checovich*, 339 Mass. 71, 157 N.E.2d 643 (1959); *Collins v. Cur-*

*tin,* 325 Mass. 123, 89 N.E.2d 211 (1949). A resulting trust can also arise when the subject property is personalty, as in this case. *Rand v. Goldblatt,* 347 Mass. 566, 199 N.E.2d 207 (1964). The fact that the word trust is not used is not determinative because "the existence of a trust does not depend upon the terminology used." *Gordon v. Gordon,* 332 Mass. 193, 195, 124 N.E.2d 226, 227 (1955). It has been said that "[w]here the owner of property transfers it to another with a direction to transfer it to . . . a third person, this may be a sufficient manifestation of an intention to create a trust." *Shipley Company, Inc. v. Darr,* 52 B.R. 271, 275 (Bankr.D.Mass. 1985) (quoting Scott on Trusts (Third ed.) § 24 at 192). Therefore, a court must determine if, at the time of the transfer, the transferor intended for the benefit to accrue to one other than the one originally taking or receiving the property. *Weston v. Stuckert,* 329 F.2d 681, 682 (1st Cir. 1964). If such an inference is determined, and no rebuttal offered, then a resulting trust can arise. *Id.*

In her deposition, Demery testified that the S.P. Richards aggregate rebate check was sent to UDI along with documentation from S.P. Richards calculating how it was to be disbursed to the Members. The "UDI–I Fee Structure" sheet called for the year-end rebate from S.P. Richards to be remitted to the Member by UDI. The terms of the contract between S.P. Richards, SOS, and UDI recites that the Member qualified for the rebate, not UDI. S.P. Richards sent to UDI documentation directing the disbursal amounts owed to each Member. In a letter to its Members dated January 13, 1999, UDI describes "looking forward to shortly receiving and distributing to you ALL of the rebates *earned by you during the past year.*" (em-

phasis supplied). Demery describes UDI as possessing the rebate check very briefly, depositing it into a "special account," confirming disbursal figures from S.P. Richards, extracting a fee, and sending the checks out to Members. On the record, it appears that S.P. Richards disbursed the rebate to UDI merely to transfer it on to the Members. No evidence was submitted that any of the parties to the transaction intended the rebate as either a gift or an equitable benefit to UDI. The inference was that S.P. Richards intended the beneficial interest in the rebate to accrue to the Members.

The Trustee's rebuttal evidence does not rise to the level necessary to overcome the inference. For example, evidence that SOS would have been in a default posture with UDI, making it ineligible for a rebate save for its involvement with the IPO, is irrelevant to the inference that S.P. Richards intended the rebates for the Members. Implying that UDI sought to use the rebates to induce its Members to refrain from withdrawing from the Pool is also irrelevant. Such inducement had no bearing on the inference that the S.P. Richards intended the rebates to be paid out to the qualified Members. And more importantly, the Trustee submitted no evidence to support such an allegation. Furthermore, no evidence supports finding that the rebates were disbursed any differently in 1999 than they had been in any previous year. Neither UDI's desperate fiscal condition nor the Members' knowledge of same amounts to a rebuttal of the inference that S.P. Richards intended the rebates to accrue to the Members.[10] As the court in *In re Tap* found, "the [transferor] relied upon the debtor's function *as a transmitter of funds and not on any expectation of the debtor's solvency.*"

---

**10.** It should be noted that in the contract underlying the rebates, the term "Dealers" is used. Under examination at trial, the term was clarified as indicating the Members.

*Shipley Company v. Darr (In re Tap Inc.)*, 52 B.R. 271, 276 (Bankr.D.Mass. 1985) (emphasis supplied).

Moreover, the fact that UDI failed to segregate the funds does not amount to a rebuttal of the inference that a trust was intended. Some courts have held that an implied trust cannot exist under circumstances where the Debtor exercised dominion over or commingled the funds in question. *See In re Farrell & Howard Auctioneers, Inc.*, 172 B.R. 712, 715 (Bankr.D.Mass.1994) (holding that debtor/auctioneer's dominion over funds from auctions established a debtor-creditor relationship and proscribed a trust relationship). In *Farrell*, the Debtor, an auctioneer and consignor, was to hold items for sale and remit the proceeds, minus any commission, to the respective consignees within fourteen (14) days after any sale. After the filing of the bankruptcy petition, the consignees sought the return of unpaid sale proceeds under the theory that the Debtor held the proceeds in trust on their behalf. *Id.* at 715. Under the terms of their agreement, the Debtor had no obligation to pay absent a sale, there was no set amount to be paid, the Debtor did not segregate the proceeds, and the Debtor was entitled to a fee. *Id.* The *Farrell* court refused to impose a trust on the proceeds under such circumstances and declared them estate property. *Id.* at 716.

*Farrell* is distinguishable. Here, the Debtor enjoyed precious little dominion over the disposition of the Transfers. The terms of the contract underlying the Transfers fixed the rebate amount; the amount owed to each Member was calculated and included by S.P. Richards with the aggregate check sent to UDI. The contract did not recite in its terms that UDI would extract a fee. If in fact UDI extracted an unauthorized fee, UDI could theoretically be subject to an action for conversion for violations of its fiduciary duties under the agency. *See Jerlyn Yacht Sales Inc. v. Roman Yacht Brokerage*, 950 F.2d 60, 67 (1st Cir.1991) (concluding "[t]hat an agent breaches his fiduciary duty to his principal by earning a 'secret profit' or commission is a rule well established in Massachusetts") (citing *Raymond v. Davies*, 293 Mass. 117, 119–20, 199 N.E. 321, 322–323 (1936)). At any rate, it would be paradoxical to somehow elevate UDI's legal interest in the Transfers to an equitable interest based on the Debtor's unauthorized actions.

Ultimately, on the question of commingling, the Court responds in two ways. First, it is true that Demery testified that the account in question was used for other purposes beyond disbursal of the rebate checks. However, the Trustee failed to introduce evidence that there were any other funds in the account between the time that the instant rebates were received and the date that they were disbursed; *actual*, not *theoretical*, commingling is the evidentiary burden. Second, even if there was commingling of the funds, that fact is not alone determinative. In order to establish the Transfers as estate property, it was the Trustee's burden to prove not only that the Debtor had legal title to the rebate proceeds, but also that the Debtor was authorized to control their disposition. *See Amdura Nat'l Distribution Co. v. Amdura Corp. (In re Amdura Corp.)*, 75 F.3d 1447, 1451 (10th Cir.1996); *Southmark Corp. v. Grosz (In re Southmark Corp.)*, 49 F.3d 1111, 1116–17 (5th Cir.1995); *Sigmon v. Royal Cake Co. (In re Cybermech, Inc.)*, 13 F.3d 818, 820–21 (4th Cir.1994). As stated by the *In re Maple Mortgage* court, "control" over commingled funds, for preference purposes means the "unfettered" right to use the funds. 81 F.3d 592 (5th Cir.1996) (finding that "while [the Debtor] had discretion

over the account itself, any presumption that it had unfettered discretion over funds at issue in the transfer was rebutted" by terms in the agreement governing the transfer). " 'Control' does not mean the ability to steal the money, or use it for personal purposes in breach of duty." *In re Schick*, 234 B.R. 337, 343 (Bankr. S.D.N.Y.1999).

Moreover, courts imposing a trust that excluded property from the bankruptcy estate have often held commingling to be of lesser import than the transferor's intent that the property benefit another. *See Pennsylvania Power & Light Co. v. Globe Store Acquisition Co. (In re Globe Store Acquisition)*, 178 B.R. 400, 403–405 (Bankr.M.D.Pa.1995) (holding that commingling was not determinative; payments of utility bills at Debtor's store were held in trust for the utility owing to customers' intent that the monies go to utility); *In re Bank of New England Corp.*, 165 B.R. at 977 (holding that where the parent had collected funds from subsidiaries in advertising account and paid ad firm; "a straight pass-through of the funds" occurred); *Shipley Company v. Darr (In re Tap Inc.)*, 52 B.R. 271, 277 (Bankr.D.Mass. 1985) (holding that while commingling of funds is a factor the court must weigh, "its presence does not dictate the finding of an absence of a trust relationship").

In the case at bar, the Transfers were held in an account that Demery described as "special" and distinct from UDI's general account. The funds were earmarked for the Members. Nothing in the record suggests that S.P. Richards indicated that UDI could use the rebate check for any purpose other than disbursal to the Members. Indeed, nothing in the record suggests that there were additional funds in the account at any relevant time. Under those circumstances, and despite the fact that the nature of the account was not restricted to receiving and processing rebate checks, this Court is satisfied that the Debtor did not, by control or commingling, prevent the creation of a resulting trust in favor of the Members.

### B. Ordinary course defenses under § 547(c)(2).

Given the decision of this Court that the Transfers were not in fact comprised of property of the estate, it is unnecessary for the Court to rule on the issue of defenses available under § 547(c)(2).

### IV. CONCLUSION

Given the foregoing findings of fact and conclusions of law, this Court finds and rules that the Transfers did not comprise property of the debtor. Accordingly, the Trustee has not met his burden of proof under § 547(b).

A judgment consistent with this Memorandum of Decision will issue in conjunction herewith.

### JUDGMENT

For the reasons provided in the Memorandum of Decision of even date, the Court finds in favor of the DEFENDANTS: A.G. Minzer Supply Corp.; Archer Office Products, Inc.; Carroll Office Supply Center; Christie's Office Supply, Inc.; Complete Office Supply, Inc.; Grand Mesa Office Supply, Inc.; Great Midwest Office Specialities Ltd.; Mark Bros. Stationers, Inc.; Mayes Printing Co., Inc.; Midwest Office Environments, Inc.; Morgan Office Centre; O.P.A.C.S., Inc.; P & L Office Supply; Seminole Office Products of Central Florida, Inc.; Stepp Office Supply, Inc.; Modern Office Products; SOS Office

Supply.[1]

---

1. These Defendants and the Plaintiff stipulated to a consolidation of the adversary proceedings under Federal Rule of Bankruptcy Procedure 7042. This Judgment bears in no way upon those Defendants named in the original Complaint that did not consolidate herein. They were: CDS Supply Company; CMRS–PB; Continental Office Supply; Crown Printing & O/S; Innovative Sales Brokers; Jane's Paper Place; Joseph Rothbard & Co.; Key Office Supply, Inc.; Lake Office Supply; Office Connection; Office Supply Inc.; Sherman Office Supply.