RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 05a0177p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

IN RE: COMPUTREX, INC.,

*Debtor.*

─────────────────

JAMES D. LYON, Trustee,

*Plaintiff-Appellant,*

*v.*

CONTECH CONSTRUCTION PRODUCTS, INC.,

*Defendant-Appellee.*

No. 04-5446

─────────────────

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 03-00410—Karl S. Forester, Chief District Judge.

Argued: March 10, 2005

Decided and Filed: April 15, 2005

Before: KENNEDY, MOORE, and SUTTON, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Chrisandrea T. Ingram, Lexington, Kentucky, for Appellant. Louis F. Solimine, THOMPSON HINE, Cincinnati, Ohio, for Appellee. Robert J. Brown, WYATT, TARRANT & COMBS, Lexington, Kentucky, for Amicus Curiae. **ON BRIEF:** Chrisandrea T. Ingram, John O. Morgan, Jr., Lexington, Kentucky, for Appellant. Louis F. Solimine, THOMPSON HINE, Cincinnati, Ohio, for Appellee. Robert J. Brown, WYATT, TARRANT & COMBS, Lexington, Kentucky, for Amicus Curiae.

─────────────────

## OPINION

─────────────────

KENNEDY, Circuit Judge. The Trustee appeals from the district court's decision affirming the bankruptcy court's order which dismissed the Trustee's Section 547 preference claim brought against Contech Construction Products, Inc. For the following reasons, we AFFIRM.

1

BACKGROUND

Contech manufacturers, sells, and distributes corrugated metal and plastic pipe. Incident to this business, Contech employs various independent freight carriers to ship its finished goods to customers throughout the country. Prior to 1988, Contech was billed by and paid these carriers directly. With an increase in orders, and thus an increase in the number of carriers it used, Contech decided to engage the debtor, Computrex, to assist it with the processing and the payment of Contech's freight charges. Computrex's business was to provide these services to shippers using multiple carriers. Over the years Contech and Computrex signed a series of agreements, the last of which, a Freight Payment Agreement, the parties entered into in April 1992. Contech and Computrex operated under this agreement until their relationship ended in the fall of 2001. As set forth in the Payment Agreement, Computrex, after receiving the bills from Contech's carriers, would process these bills and send a compiled invoice to Contech at the end of each week. Contech would then wire payment sufficient to cover both the freight carriers' invoices and Computrex's fee to Computrex each Monday. Computrex was then to issue carrier checks Monday night and to mail the checks to the carriers on Tuesday morning.

In contravention of the Payment Agreement, however, Computrex began to "float" various carriers' checks after issuance. That is, after printing the carrier checks and reporting the issuance date to its clients, including Contech, Computrex would then hold onto the checks for a period of time to obtain as much interest as it could on the funds before dispersing them to the carriers. In the months leading up to this bankruptcy, the length of time that Computrex held the checks began to increase, as Computrex lacked sufficient funds to cover the checks. In the beginning of the float plan, the carrier checks took an average of nine days to clear the bank. By the time the involuntary bankruptcy petition was filed against Computrex, the carrier checks took an average of eighteen to twenty-one days to clear the bank after they had been printed.

Additionally, it was Computrex's practice, upon receipt of complaints from its clients regarding the delay in dispersing payment to its carriers, to pay the carriers of complaining clients ahead of the carriers of other clients in the queue. Pursuant to this practice, payments in the amount of $4,490,414.04 were made to Contech's carriers within ninety days of the filing of the involuntary petition in this case. As a result, Contech's carriers were only owed approximately $300.00 while other clients' carriers were owed over twenty-four million dollars at the time five creditors of Computrex filed an involuntary Chapter 7 bankruptcy petition against it on December 20, 2001. In his complaint against Contech, the Trustee argues that Computrex, in disbursing the nearly $4.5 million dollars to pay Contech's carriers, preferred Contech over other similarly situated creditors in violation of Section 547 of the Bankruptcy Code.

ANALYSIS

We review the district court's order granting Contech's motion to dismiss *de novo*. *Pfennig v. Household Credit Servs. Inc.,* 286 F.3d 340, 343 (6th Cir. 2002).

Section 547 of the Bankruptcy Code enforces "equality of distribution of assets among similarly situated creditors, according to the priorities set forth within the code." 5 Collier on Bankruptcy ¶ 541.01 (15th Rev. ed. 2001). The Bankruptcy Code preference scheme thus requires "[a]ny creditor that received a greater share of payment than others of his class . . . to disgorge so that all may share equally. The operation of the preference section to deter 'the race of diligence' of creditors to dismember the debtor before bankruptcy furthers the second goal of the preference section, that of equality of distribution." *Id.* ¶ 547.01

Section 547(b) of the Bankruptcy Code sets forth the elements that a trustee must establish in order to present a prima facie preference claim:

(b)      [T]he trustee may avoid any transfer of an interest of the debtor in property
(1)      to or for the benefit of a creditor;

    (2)     for or on account of an antecedent debt owed by the debtor before such transfer was made;[1]

    (3)     made while the debtor was insolvent;

    (4)     made -

        (A)    on or within 90 days before the date of the filing of the petition; or

        (B)    between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

    (5)     that enables such creditor to receive more than such creditor would receive if -

        (A)    the case were a case under chapter 7 of this title;

        (B)    the transfer had not been made; and

        (C)    such a creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

Within ninety days of the filing of the involuntary bankruptcy petition against the Debtor, Contech wired nearly four and a half million dollars to the Debtor to pay its carriers' invoices, and the Debtor disbursed this amount to Contech's carriers. The district court held that the Trustee could not avoid this payment as a preferential transfer since the funds the Debtor transferred to Contech's carriers were not part of the Debtor's estate, as the Debtor was merely a disbursing agent for Contech and thus did not exercise sufficient control and dominion over the funds for them to constitute part of its estate. *See* 11 U.S.C. § 547(b) (before a trustee can establish a preference claim, he must establish that the alleged preference transfer was a property interest of the debtor).

The Trustee argues that the Debtor asserted such control and dominion over the funds received from its clients, including Contech, that it cannot be considered a mere disbursing agent. As evidence of the Debtor's control and dominion over the funds its clients transferred to it, the Trustee notes that all of the Debtor's clients' funds were commingled in one account; that it exercised discretion in increasing the float period; and that it decided which clients would be paid first. In support of its argument, the Trustee relies upon *McLemore v. Third National Bank in Nashville (In re Montgomery)*, 983 F.2d 1389 (6th Cir. 1993). Unlike the instant case, which involves the transfer of money between three parties, *In re Montgomery* merely involved a loan between a debtor and a bank. *Id*. at 1390. During the preference period, the defendant bank loaned two million dollars to the debtor, and the debtor paid off this loan through commingled funds received from other creditors. *Id*. at 1389-90. The trustee in *Montgomery* brought a preference adversary action against the defendant bank to recover the value of the payoff received from the debtor. *Id*. at 1390. In finding that this payment was part of the debtor's estate, the court concluded that a preference was created because the debtor effectively borrowed nonearmarked funds and exercised control over those funds by using them to pay a preferred creditor over others. *Id*. at 1395. The Trustee argues that since Contech's funds were not earmarked to pay Contech's carriers, but rather were commingled with the

---

[1]Although we need not address this element since we hold below that the funds the Debtor distributed to pay Contech's carriers were not property of the Debtor's estate, we note that the transfers made by the Debtor to Contech's carriers were also not made on account of an antecedent debt owed on behalf of the Debtor. The Trustee argues that the Debtor became liable on an "antecedent debt" when Contech transferred its funds to the Debtor. Although the payment agreement obligated the Debtor to complete the transaction by disbursing Contech's money to its freight carriers, the Debtor disbursed this money not because of an "antecedent debt" it owed to Contech, but because of its contractual promise to Contech for which the Debtor had been paid. The Bankruptcy Code defines a "debt" as not just a mere obligation, but rather as a "liability on a claim." 11 U.S.C. § 101(12). As such, under the Code, a debt arises only when the obligation comes due, and therefore must be paid out of the debtor's assets. Because the Debtor transferred the funds to Contech's creditors, no other obligation came due that the Debtor was required to satisfy. That is, the Debtor has no liability to the freight carriers or to Contech because no obligation "comes due" unless and until the Debtor, by misappropriating Contech's money, actually fails to pay the freight carriers.

funds the Debtor received from other clients, this establishes that Contech's funds were within the Debtor's control, and thus constituted part of the Debtor's estate.

*In re Montgomery* does not support the Trustee's position because, unlike the bank in *Montgomery*, Contech never loaned, or otherwise conveyed any ownership interest in, the $4.5 million to the Debtor. Rather, the funds Contech transferred to the Debtor were given with the sole purpose of thereby allowing the Debtor to pass the funds on to Contech's carriers. The Payment Agreement in force between the parties demonstrates the Debtor's narrow function:

### Invoicing

Processed bills, invoice and weekly reports will be mailed on Friday for anticipated arrival on Monday. A copy of the invoice will be faxed on Friday.

### Terms

Payment for freight and service charges will be wired to [the Debtor]'s bank by 2 p.m. EST on Monday corresponding to invoice date. If payment is received as noted above, carrier checks will be issued Monday night and mailed Tuesday morning.

As the district court properly noted, "the authority granted [the Debtor] with respect to Contech's funds is limited. The contract does not anticipate that [the Debtor], between receipt of Contech's funds and payment to Contech's carriers . . . would have any dominion or control over [the] funds, or would be able to put them to any other use than that designated by the contract. The relationship was strictly defined, and [the Debtor]'s brief possession of Contech's funds was to be similar to that of a transfer station along the road to payment of Contech's carriers." *See, e.g., Shipley Co. v. Darr* (*In re Tap, Inc.*), (Bankr. D. Mass. 1985) (finding that the debtor never acquired an interest in its client's funds where the client "paid money to the debtor for the express purpose of paying third parties. The delivery of funds [to the debtor] by the [client] rested upon the clear understanding . . . that the funds were to be remitted promptly to the appropriate [third-parties]. . . . There was no consent to the debtor's use of such funds for its own purposes. . . .").

The Trustee argues that the district court erred in relying upon the Payment Agreement to find that the funds disbursed by the Debtor were not part of the Debtor's estate for two reasons. First, he asserts that since the Payment Agreement did not require the Debtor to pay Contech's freight carriers with Contech's own funds, it was therefore permitted to commingle its clients' funds. This evidences, the Trustee continues, that the Debtor exercised sufficient control and dominion over the funds to establish that the funds constituted part of the Debtor's estate. The fact that the Payment Agreement did not explicitly prohibit the Debtor from commingling its clients' funds, and the fact that the Debtor did in fact commingle its clients' funds, does not establish that the funds were part of the Debtor's estate. The Payment Agreement indicates that the funds the Debtor received were to be passed on to pay its clients' carriers. The Debtor here is in essentially the same position as a bailee: Contech (the bailor) directed the Debtor (the bailee) to take possession of Contech's money and subsequently disburse it to Contech's creditors. *See Jones v. Hanna*, 814 S.W.2d 287, 288 (Ky. Ct. App. 1991) ("A 'bailment' . . . imports the delivery of personal property by one person to another in trust for a specific purpose, with a contract, express or implied, that the trust shall be faithfully executed, and the property returned or duly accounted for when the special purpose is accomplished . . . ."); *Hargis v. Spencer*, 71 S.W. 2d 666, 667 (Ky. Ct. App. 1734)(recognizing that there can be bailment of money). As a bailee, the Debtor lacked any property interest in Contech's money. Collier, *supra*, ¶ 551.06[1][a] ("It has been settled under the Code and prior law that, if property was in a debtor's hands as bailee or agent, the debtor's estate holds only the same interest, and the bailor or principal could recover the property or its proceeds."). The fact that a bailee, which has a possessory interest in the property entrusted to him, but no legal or equitable interest, may commingle the funds his clients entrust to him does not give the bailee any property interest in the funds. *See In Re Crouthamel*

*Potato Chip Co.,* 6 B.R. 501, 507 (Bankr. E.D. Pa. 1980) ("It has been consistently held that where there exists a true agency relationship, such as a bailment, a transfer by the agent of agency property to the principal is not a voidable preference.  The reason is that the transfer is not of property of the debtor but of property of the principal.") (citations omitted).

The Trustee also argues that the district court should not have relied upon the Payment Agreement to find that the funds Contech disbursed to the Debtor were not part of the Debtor's estate since, in light of the float plan the Debtor conducted, the Payment Agreement entered into between the Debtor and Contech "essentially no longer controlled the manner in which the Debtor financially conducted business" with Contech.  There is no evidence, however, that Contech acquiesced in the Debtor's conduct.  Rather, the reason the Debtor disbursed Contech's $4.5 million to pay Contech's carriers is because Contech complained to the Debtor about its failure to pay its carriers on time.  In any event, even if there were evidence that Contech acquiesced in the Debtor's float plan, that would not mandate a contrary result since we will not condone a debtor's improper application of funds to justify that the funds were property of the debtor's estate.  *See Schilling v. Electronic Realty Assocs. Inc., (In re Hearn)*, 49 B.R. 143 (Bankr. W.D. Ky. 1985) ("Had the debtor exercised the degree of control the Trustee argues was possible, and which the Trustee maintains justifies deeming these funds property of the estate, his actions would have been violative of the express terms and conditions upon which the arrangement was based.  Such speculation of an improper application of funds to justify what is property of the estate will not be condoned."); *In re Udi Corp.*, 301 B.R. 104, 114-15 (Bankr. D. Mass. 2003) ("'Control' over commingled funds, for preference purposes, means the 'unfettered' right to use the funds. . . .  'Control' does not mean the ability to steal the money, or use it for personal purposes in breach of duty.") (citing *In re Maple Mortgage, Inc.,* 81 F.3d 592, 596 (5th Cir. 1996) ("while [the debtor] had discretion over the account itself, any presumption that it had unfettered discretion over the funds at issue in the transfer was rebutted" by the terms in the agreement governing the transfer)).

Since the funds the Debtor received from Contech and disbursed to Contech's carriers were not part of the Debtor's estate, as the Debtor was merely a disbursing agent which did not exercise sufficient control and dominion over the funds for them to constitute part of its estate, we AFFIRM the district court's judgment affirming the bankruptcy court's order which dismissed the Trustee's preference claim.