# United States Court of Appeals
## For the First Circuit

No. 17-1912

IN RE MONTREAL, MAINE & ATLANTIC RAILWAY, LTD.,

Debtor.

ROBERT J. KEACH, solely in his capacity as the Chapter 11
trustee for MONTREAL, MAINE & ATLANTIC RAILWAY, LTD.,

Appellant,

v.

WHEELING & LAKE ERIE RAILWAY COMPANY,

Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Jon D. Levy, U.S. District Judge]
[Hon. Peter G. Cary, U.S. Bankruptcy Judge]

Before

Thompson, Circuit Judge,
Souter,[*] Associate Justice,
and Selya, Circuit Judge.

---

[*]Hon. David H. Souter, Associate Justice (Ret.) of the Supreme
Court of the United States, sitting by designation.

Robert J. Keach, with whom Lindsay K.Z. Milne, Roma N. Desai, and Bernstein, Shur, Sawyer & Nelson, P.A. were on brief, for appellant.

George J. Marcus, with whom David C. Johnson, Andrew C. Helman, and Marcus, Clegg & Mistretta, P.A. were on brief, for appellee.

————————————

April 18, 2018

————————————

**SELYA**, **Circuit Judge**. This appeal requires us to explore the labyrinth of high-stakes bankruptcy law to determine whether the proceeds of a multi-million-dollar sale of certain railroad lines constituted property of the bankruptcy estate. Although we are skeptical of the rationale employed by the courts below and thread our way through this maze along a different ratiocinative path, we arrive at the same place: we conclude that the disputed funds were not property of the bankruptcy estate. Consequently, we affirm the dismissal of the complaint.

## I. BACKGROUND

Because this appeal challenges an order of dismissal for failure to state an actionable claim, we take the facts from the well-pleaded averments contained in the complaint, supplemented from other permissible sources. See Banco Santander de P.R. v. Lopez-Stubbe (In re Colonial Mortg. Bankers Corp.), 324 F.3d 12, 15-16 (1st Cir. 2003). In carrying out this task, we assume the reader's familiarity with our opinion in earlier litigation involving the same parties. See Wheeling & Lake Erie Ry. v. Keach (In re Montreal, Me. & Atl. Ry.) (MMA I), 799 F.3d 1, 3-4 (1st Cir. 2015).

In 2002, Montreal, Maine & Atlantic Railway, Ltd. (the debtor) and a group of related entities purchased the assets of several United States and Canadian railways. On January 8, 2003, a consortium of investors (the 2003 Investors) provided

- 3 -

$15,000,000 to the purchasers in return for a series of subordinated notes and warrants. Despite this infusion of cash, the debtor soon found itself strapped and procured a $34,000,000 loan from the Federal Railroad Administration (the FRA). As part of this transaction, the FRA obtained a senior lien on all of the debtor's rail lines and related improvements in the United States. Several years later, the appellee, Wheeling & Lake Erie Railway Company (Wheeling), furnished a $6,000,000 line of credit to the debtor — a transaction memorialized by a promissory note dated June 15, 2009 and a security agreement.

Notwithstanding these efforts, the debtor struggled to meet its financial obligations. By late 2010, it owed $906,579.38 in overdue principal and $1,466,355.58 in accrued interest to the FRA. To obtain needed funds, the debtor proposed to sell approximately 233 miles of track located in northern Maine (the Lines) to the State of Maine. In order to make this transaction feasible, the debtor enlisted FRA's cooperation and, on December 29, 2010, it agreed with the FRA to amend the existing loan agreement.

This amendment, which we shall call the Second Amendment, lies at the epicenter of this litigation. Under Section 3.b, the FRA agreed to provide "a limited waiver" of its senior lien over the Lines, which would take effect "upon the closing" of the proposed sale to the State of Maine. In exchange, the FRA

received a replacement lien on certain of the debtor's property in Canada.

As relevant here, the FRA conditioned its "limited waiver" of its senior lien on the debtor's compliance with a series of conditions spelled out in Section 3.b.ii of the Second Amendment. The FRA concluded that these conditions and the concomitant amendments to the parties' prior agreement were "equitable and in the overall best interest of the United States" in accordance with 45 U.S.C. § 823.

Pertinently, the Second Amendment required the debtor, upon the closing of the sale, to convey the proceeds to an escrow agent. Once the FRA's replacement lien on the Canadian property had been perfected, the debtor was to pay the FRA roughly $2,400,000 of the sale proceeds (representing the sum of the FRA's overdue principal and accrued interest), pay roughly $14,000,000 to the 2003 Investors, reserve roughly $1,000,000 to defray certain accounts payable, and distribute the remainder of the proceeds to Wheeling to reduce the debtor's outstanding balance under the 2009 credit agreement.

The record contains few details as to how the parties shaped the contours of this waterfall of disbursements. In this regard, though, the complaint does allege that the 2003 Investors "demanded full payment as a condition to allowing the transaction to occur." The complaint also alleges an overlap between the

leadership of Wheeling and the leadership of the debtor. It offers several examples of this perceived overlap, such as the fact that Larry R. Parsons was the principal owner of Wheeling and served as a board member of the debtor and the fact that ABC Railway (a wholly owned subsidiary of Wheeling) was a shareholder of the debtor's parent company.

On January 4, 2011, the State of Maine agreed to pay approximately $21,000,000 for the Lines (of which approximately $1,000,000 was to be retained by Maine and applied to other debt owed to Maine). The debtor distributed the proceeds in accordance with the waterfall provision of the Second Amendment, with the result that Wheeling received $2,708,912.20 (which was applied to pay down the debtor's outstanding line of credit). Despite this effort to stanch the flow of red ink, the debtor's financial woes persisted and, in mid-2013, it filed a voluntary petition for protection under Chapter 11 of the Bankruptcy Code. See 11 U.S.C. § 301. The bankruptcy court appointed the appellant, Robert J. Keach, as the Chapter 11 trustee (the Trustee).[1]

On May 26, 2015, the Trustee instituted an adversary proceeding against Wheeling, seeking to avoid the waterfall disbursement made to it as constructively fraudulent under section

_____

[1] During the pendency of this proceeding, the Trustee was appointed estate representative of the post-effective-date estate pursuant to the debtor's chapter 11 plan of liquidation. For ease in reference, we refer to him throughout as the Trustee.

- 6 -

5(b) of Maine's Uniform Fraudulent Transfer Act (UFTA), which proscribes certain conveyances by an insolvent debtor to an "insider." See id. § 544(b); 14 M.R.S.A. § 3576(2). Wheeling moved to dismiss the Trustee's complaint pursuant to Rule 7012 of the Federal Rules of Bankruptcy Procedure. It argued that the waterfall disbursements did not consist of "assets" belonging to the debtor and, in the alternative, that the Trustee had failed plausibly to allege that Wheeling was an "insider" vis-à-vis the debtor. Accepting Wheeling's first argument, the bankruptcy court dismissed the complaint with prejudice for failure to state an actionable claim. It reasoned that because the waterfall disbursements were part of a single transaction, all aspects of which should be deemed to have occurred simultaneously, they remained encumbered by the FRA's lien up to and until the time of disbursement (and, therefore, did not comprise property belonging to the debtor). The bankruptcy court did not reach Wheeling's alternative ground for dismissal.

The Trustee appealed to the federal district court, which affirmed on substantially similar reasoning. See Keach v. Wheeling & Lake Erie Ry. (In re Montreal, Me. & Atl. Ry.) (MMA II), No. 1:17-CV-00012, 2017 WL 3485560, at *4-5 (D. Me. Aug. 14, 2017). This timely second-tier appeal followed.

- 7 -

## II. ANALYSIS

Congress has established a two-tiered framework for appellate review in bankruptcy cases. See MMA I, 799 F.3d at 4-5; City Sanitation, LLC v. Allied Waste Servs. of Mass., LLC (In re Am. Cartage, Inc.), 656 F.3d 82, 87 (1st Cir. 2011). A litigant ordinarily may take a first-tier appeal either to the bankruptcy appellate panel or to the district court. See 28 U.S.C. § 158(a)-(b). No matter which route is pursued for a first-tier appeal, further review is available in the court of appeals. See MMA I, 799 F.3d at 5. In such second-tier proceedings, no particular deference is afforded to the determinations of the first-tier appellate adjudicator but, rather, we "train the lens of our inquiry directly on the bankruptcy court's decision." Id.

As said, the bankruptcy court dismissed the complaint under Bankruptcy Rule 7012(b), which in effect replicates Federal Rule of Civil Procedure 12(b)(6). In such circumstances, the jurisprudence of Rule 12(b)(6) applies with full force. See Privitera v. Curran (In re Curran), 855 F.3d 19, 24 (1st Cir. 2017).

We review an order granting a motion to dismiss for failure to state a claim de novo. See González v. Vélez, 864 F.3d 45, 50 (1st Cir. 2017). In conducting this tamisage, we accept the complaint's well-pleaded facts as true and "draw all reasonable inferences therefrom in the pleader's favor." Id. "[A] complaint

- 8 -

need not set forth 'detailed factual allegations,'" In re Curran, 855 F.3d at 25 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)), "but it must 'contain sufficient factual matter . . . to state a claim to relief that is plausible on its face,'" id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

The plausibility standard requires a court to choreograph a two-step pavane. See A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 80 (1st Cir. 2013). First, the court must "strip away and discard the complaint's conclusory legal allegations." Shay v. Walters, 702 F.3d 76, 82 (1st Cir. 2012). Second, "the court must determine whether the remaining facts allow it 'to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Jane Doe No. 1 v. Backpage.com, LLC, 817 F.3d 12, 24 (1st Cir. 2016) (quoting Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012)). Dismissal is warranted when a complaint's factual averments are "too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture." SEC v. Tambone, 597 F.3d 436, 442 (1st Cir. 2010) (en banc).

Against this backdrop, we turn to the plausibility vel non of the Trustee's claim.[2] The bankruptcy code authorizes a

---

[2] The Trustee, who did not attach a copy of the Second Amendment to his complaint, argues that we may not rely on language in the Second Amendment in gauging plausibility. This argument rings hollow. While we primarily "draw the facts from the

- 9 -

trustee to "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an [allowable] unsecured claim . . . ." 11 U.S.C. § 544(b)(1). A prevailing trustee "may recover, for the benefit of the bankruptcy estate," either the property transferred fraudulently or its equivalent value. Id. § 550(a); see Merit Mgmt. Grp., LP v. FTI Consulting, Inc., 138 S. Ct. 883, 889 (2018). "[A]ny property the trustee recovers becomes estate property and is divided pro rata among all general creditors." Cadle Co. v. Mims (In re Moore), 608 F.3d 253, 260 (5th Cir. 2010) (emphasis omitted).

The interpretation of the language employed by Congress in drafting the bankruptcy code — including, as pertinent here, the term "interest of the debtor in property" under section 544(b) — is a matter of federal law. See Abboud v. Ground Round, Inc.

---

operative version of the complaint" in assessing the bona fides of a motion to dismiss, González, 864 F.3d at 48, we may supplement those facts in certain ways, see, e.g., Haley v. City of Bos., 657 F.3d 39, 46 (1st Cir. 2011) (identifying, inter alia, "documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice" as permissible sources of facts); In re Colonial Mortg., 324 F.3d at 15-16 (similar). Here, the complaint repeatedly references the Second Amendment, and the Trustee's entire case hinges on a construction of that contract. Because the complaint's averments are explicitly tied to and dependent upon the Second Amendment (the authenticity of which is not challenged), the Second Amendment is fair game in gauging the plausibility of the complaint. See Beddall v. State St. Bank & Tr. Co., 137 F.3d 12, 17 (1st Cir. 1998). We proceed accordingly.

(In re Ground Round, Inc.), 482 F.3d 15, 17 (1st Cir. 2007). Even so, "the existence and extent of the debtor's interest is ordinarily a creature of state law." Id. (emphasis in original) (citing Butner v. United States, 440 U.S. 48, 54-55 (1979)). This framework requires us to make a bifurcated determination: we first must determine the scope of the debtor's property rights under state law and then look to federal law, which "dictates to what extent that interest is property of the estate." Rent-A-Ctr. E., Inc. v. Leonard (In re WEB2B Payment Sols., Inc.), 815 F.3d 400, 405 (8th Cir. 2016) (quoting N.S. Garrott & Sons v. Union Planters Nat'l Bank of Memphis (In re N.S. Garrott & Sons), 772 F.2d 462, 466 (8th Cir. 1985)).

In the case at hand, the parties agree that Maine is the source of the relevant state law, and we follow their lead. See Rok Builders, LLC v. 2010-1 SFG Venture LLC (In re Moultonborough Hotel Grp., LLC), 726 F.3d 1, 5 n.3 (1st Cir. 2013). When applying Maine law, we rely principally on the jurisprudence of its highest court (the Maine Supreme Judicial Court, commonly called the Law Court). See Butler v. Balolia, 736 F.3d 609, 612 (1st Cir. 2013). Absent an on-point decision of the Law Court, we "endeavor to predict how [the Law Court] would likely decide the question" by relying on the "types of sources that the state's highest court would be apt to consult," such as persuasive out-of-state

- 11 -

precedents, learned treatises, and public policy considerations. Id. at 613; see MMA I, 799 F.3d at 10.

The Trustee alleges that Maine's version of the UFTA renders the waterfall disbursement to Wheeling voidable. Under that statute, a "transfer" of an asset by a debtor "is fraudulent as to a creditor whose claim arose before the transfer" if the debtor, while insolvent, made the conveyance "to an insider for an antecedent debt" and "the insider had reasonable cause to believe that the debtor was insolvent." 14 M.R.S.A. § 3576(2). Wheeling denies not only that it was chargeable with "insider" status but also that the waterfall disbursement to it involved any "assets" of the bankruptcy estate.

For purposes of the UFTA, "transfer" and "asset" are terms of art.[3] A "transfer" consists of "[e]very mode . . . of disposing of or parting with an asset or an interest in an asset." Id. § 3572(12). An "asset" includes "property of a debtor," but does not include "[p]roperty to the extent that it is encumbered by a valid lien." Id. § 3572(2).

The parties argue at length about when the FRA's release of its lien on the Lines took effect. The Trustee says that this

_____

[3] "Insider" is likewise a term of art, but one that need not concern us. Because we conclude that the waterfall disbursements did not implicate assets belonging to the bankruptcy estate, see infra, we have no occasion to address Wheeling's alternative defense.

- 12 -

occurred prior to the making of the waterfall disbursement to Wheeling. In Wheeling's view, though, the lien remained in effect until the debtor fully complied with the Second Amendment's waterfall provision. Like the bankruptcy court, the district court agreed with Wheeling, concluding that all of the waterfall disbursements dealt with property that was encumbered at the time of the transfer and, for that reason, did not involve "assets" of the debtor. See MMA II, 2017 WL 3485560, at *5; see also 14 M.R.S.A. § 3572(2), (12).

We need not resolve the knotty questions concerning the temporal relationship between the FRA's release of its lien and the waterfall disbursements. Even if we assume for argument's sake that the Lines were no longer encumbered by the FRA's lien at the time the waterfall disbursement to Wheeling was made, the debtor did not hold an interest in that property that is voidable under section 544(b). We explain briefly.[4]

---

[4] Although our reasoning differs from that of the courts below, such a variance is wholly permissible. When reviewing the grant of a motion to dismiss for failure to state a claim, we are not wed to the lower court's reasoning but may affirm on any ground supported by the record. See Kando v. R.I. State Bd. of Elections, 880 F.3d 53, 58 (1st Cir. 2018); González, 864 F.3d at 50.

In a related vein, the Trustee complains that the ground we find dispositive was not argued by Wheeling in the bankruptcy court. This plaint is unavailing. When engaged in de novo review, "[w]e are at liberty to affirm a district court's judgment on any ground made manifest by the record, whether or not that particular ground was raised below." United States v. George, ____ F.3d ___, ___ (1st Cir. 2018) [No. 17-1371, slip op. at 15]; accord Hoover v. Harrington (In re Hoover), 828 F.3d 5, 8 (1st Cir. 2016); Doe

- 13 -

The solution to this puzzle hinges on the Second Amendment. In Maine, as elsewhere, "[i]nterpretation of an unambiguous [contract] provision is a matter of law, and the provision is given its plain, ordinary, and generally accepted meaning." Daniel G. Lilley Law Off., P.A. v. Flynn, 129 A.3d 936, 940 (Me. 2015) (quoting Reliance Nat'l Indem. v. Knowles Indus. Servs., Corp., 868 A.2d 220, 228 (Me. 2005)). As the plain language of the Second Amendment makes pellucid, the relationship between the contracting parties (the debtor and the FRA) was akin to a bailment, which is an arrangement involving "the delivery of personal property by one person to another in trust for a specific purpose, with a contract . . . that the trust shall be faithfully executed and the property returned or duly accounted for when the special purpose is accomplished . . . ." Frost v. Chaplin Motor Co., 25 A.2d 225, 226 (Me. 1942) (citation omitted); see Westleigh v. Conger, 755 A.2d 518, 519-20 (Me. 2000); Levesque v. Nanny, 53 A.2d 703, 704 (Me. 1947).

Here, the FRA initially held title to the Lines as mortgagee. See Mortg. Elec. Regist. Sys., Inc. v. Saunders, 2 A.3d 289, 294 (Me. 2010). As such, it controlled the proposed sale of the Lines (which were to be sold for an amount that was

v. Anrig, 728 F.2d 30, 32 (1st Cir. 1984) (Breyer, J.). In any event, there is no unfairness here: the dispositive ground was briefed and argued both in the district court and in this court.

- 14 -

less than the amount of debt secured by its lien).  Through the Second Amendment, the FRA approved the sale of the Lines and waived its lien.  With respect to consideration, the FRA required, among other things, that the proceeds from the sale be paid to an "escrow agent"[5] for the special purpose of distributing those funds to the parties enumerated in Section 3.b.ii. of the Second Amendment upon perfection of the FRA's replacement lien.  Cf. Dean Witter Reynolds Inc. v. Variable Annuity Life Ins. Co., 373 F.3d 1100, 1108 (10th Cir. 2004) (explaining that placement of "monies . . . in accounts for certain specific purposes, such as escrow accounts" may establish bailment at common law); Lawrence v. Lincoln Cty. Tr. Co., 131 A. 863, 867 (Me. 1926) (similar).

Whatever the proper label for this type of transaction, the bottom line is that the debtor could not have put the proceeds to any use that was not authorized by the FRA under the terms of the Second Amendment.  Pertinently for present purposes, the Second Amendment had the effect of forbidding the debtor from using the

---

[5] The term "escrow" is often used to describe "[a]n account held in trust or as security."  Black's Law Dictionary, 662 (10th ed. 2014).  Although the Second Amendment can be read to allow the selection of a third party to serve as escrow agent for the purpose of making the specific distributions, it appears from the record that the debtor itself served this function.  In all events, nothing turns on the identity of the party serving this function, and the Trustee has not alleged that the failure to appoint an independent escrow agent was in any way adverse to the rights of the bankruptcy estate.

- 15 -

proceeds to pay general creditors save for the approximately $1,000,000 that was earmarked for accounts payable.

Having determined that, under Maine law, the waterfall provision created a relationship resembling a bailment, our analysis must proceed under applicable federal law, that is, under section 544(b). As the Supreme Court has explained in construing similar language under section 547(b), the term "'property of the debtor' . . . is best understood as that property that would have been part of the estate had it not been transferred before the commencement of the bankruptcy proceedings." Begier v. IRS, 496 U.S. 53, 58 (1990); see Stettner v. Smith, (In re IFS Fin. Corp.), 669 F.3d 255, 261 (5th Cir. 2012) (applying Begier in the section 544(b)(1) context). In other words, "[a] bankruptcy estate cannot succeed to a greater interest in property than the debtor held prior to bankruptcy." NTA, LLC v. Concourse Holding Co. (In re NTA, LLC), 380 F.3d 523, 528 (1st Cir. 2004) (citing 11 U.S.C. § 541(d)).

"[T]he principal determinant of whether the debtor has 'an interest' in the property" is "the degree of control a debtor exercises over the property transferred." MBNA Am. Bank, N.A. v. Meoli (In re Wells), 561 F.3d 633, 635 (6th Cir. 2009) (quoting McLemore v. Third Nat'l Bank (In re Montgomery), 983 F.2d 1389, 1395 (6th Cir. 1993)); accord Southmark Corp. v. Grosz (In re Southmark Corp.), 49 F.3d 1111, 1116-17 & n.16-17 (5th Cir. 1995).

- 16 -

So, for example, a bank account used by a debtor to pay general creditors of its own choosing may be avoidable, even if the bank account is in another person's name. See Riley v. Nat'l Lumber Co. (In re Reale), 584 F.3d 27, 31 (1st Cir. 2009). By contrast, property is not part of the bankruptcy estate when "the debtor merely receives [it] in order to deliver it to its intended recipient without any control or ownership over it." City of Springfield v. Ostrander (In re LAN Tamers, Inc.), 329 F.3d 204, 210 (1st Cir. 2003). So, for example, if a debtor incurs health-care expenses covered by insurance, and the insurance company sends payment to the debtor before the debtor pays the health-care provider, the insurer's payments would not be property recoverable by the debtor's creditors. See id. (citing S. Rep. No. 95-989, at 82 (1978), as reprinted in 1978 U.S.C.C.A.N. 5787, 5868; H.R. Rep. No. 95-595 (1978), at 368, as reprinted in 1978 U.S.C.C.A.N. 5963, 6324). It follows that where, as here, the debtor holds funds as a mere disbursing agent pursuant to a contract that prevents it from putting the funds to any use other than that designated in the contract, the trustee cannot avoid the debtor's transfer of the funds in compliance with the contract. See Lyon v. Contech Constr. Prods., Inc. (In re Computrex, Inc.), 403 F.3d 807, 811, 813 (6th Cir. 2005); see also Old Republic Nat'l Title Ins. Co. v. Tyler (In re Dameron), 155 F.3d 718, 722-23 (4th Cir. 1998).

These limitations on the scope of the bankruptcy estate make good commercial sense. They prevent unsecured creditors from sharing in funds that the debtor could not have retained for its own use. See In re LAN Tamers, 329 F.3d at 215. By the same token, such limitations are consistent with the Supreme Court's admonition that the law "does not authorize a trustee to distribute other people's property among a bankrupt's creditors." Pearlman v. Reliance Ins. Co., 371 U.S. 132, 135-36 (1962).

The upshot is that the debtor was a mere "transfer station along the road to payment" of the parties specified under the waterfall provision. In re Computrex, 403 F.3d at 811 (citation omitted). Thus, it lacked a cognizable property interest in the waterfall disbursement paid to Wheeling. See id. Consequently, that disbursement is not avoidable under section 544(b).

In an effort to blunt the force of this reasoning, the Trustee relies heavily on the use of the disbursements to pay down the debtor's indebtedness. He attempts to draw an analogy to preferential transfer cases under section 547(b) in which third parties pay off general creditors as part of the purchase price of a debtor's assets. See, e.g., Warsco v. Preferred Tech. Grp., 258 F.3d 557, 565-66 (7th Cir. 2001); Buckley v. Jeld-Wen, Inc. (In re Interior Wood Prods. Co.), 986 F.2d 228, 231 (8th Cir. 1993); Feltman v. Bd. of Cty. Comm'rs. of Metro. Dade Cty. (In re S.E.L.

Maduro (Fla.), Inc.), 205 B.R. 987, 991-92 (Bankr.S.D.Fla. 1997). The Trustee says that this case is of the same genre because the Lines were sold to a third party and some (but not all) of the debtor's creditors received portions of the sale proceeds to satisfy existing debts.

We find this proffered analogy unpersuasive. The preferential transfer cases hawked by the Trustee rest on the notion that "[if] the funds the third party used to pay the creditor were consideration for the debtor's sale of its assets," then those funds are considered "property" of the estate because they "would have been available for distribution" to the general pool of creditors "had they not been transferred." Warsco, 258 F.3d at 565; cf. Begier, 496 U.S. at 58 (explaining bankruptcy code's "central policy" of ensuring "[e]quality of distribution among creditors").

The case at hand is a horse of a quite different hue: unlike in these preferential transfer cases, the Lines were not "assets" that belonged outright to the debtor prior to consummation of the relevant transactions but, rather, were subject to the FRA's mortgage and lien. See 14 M.R.S.A. § 3572(2). As the Trustee readily acknowledges, "the FRA would have been entitled to the proceeds" from a sale of the Lines "but for" the Second Amendment. And although the FRA granted a limited waiver of its lien, it conditioned that waiver on the debtor's distribution of the

- 19 -

proceeds in compliance with the Second Amendment's waterfall provision. The FRA made a choice to allocate the proceeds to which it was entitled among certain of the debtor's creditors, an allocation that it apparently concluded was "equitable and in the overall best interest of the United States."

Seen in this light, it is readily apparent that this is not a case in which a debtor decides to sell his assets and divert the proceeds to pay certain creditors to the detriment of others. Instead, it is a case in which a senior lienholder imposes conditions that preclude the debtor from exercising effective control over the sale proceeds. Accordingly, the waterfall disbursement to Wheeling did not consist of property of the debtor's estate. See In re Computrex, 403 F.3d at 813.

The Trustee nonetheless insists that other averments in the complaint render his allegations about the debtor's control over the waterfall disbursements plausible. As he sees it, the debtor "could not have 'paid' [Wheeling] if it did not have control or dominion over the proceeds." The fly in this ointment is that the Trustee mistakenly equates the debtor's possession of the sale proceeds with its control over those proceeds. The mere fact that the debtor briefly possessed the sale proceeds (apparently as an escrow agent) does not mean that it had any discretion to use those proceeds as it saw fit.

Were the Trustee's reasoning valid, any property possessed by a bailee, however fleetingly, would become property of that bailee's estate in a bankruptcy proceeding. This proposition is untenable. The law is luminously clear that, in the absence of a state statute to the contrary — and no such statute has been cited here — "if property is in a debtor's hands as bailee or agent," that property is not recoverable by the bankruptcy trustee. 5 Collier on Bankruptcy ¶ 541.05 (A.N. Resnick & H.J. Sommer, eds., 16th ed. 2017); see Kitchen v. Boyd (In re Newpower), 233 F.3d 922, 933 (6th Cir. 2000); Torkelson v. Maggio (In re The Guild & Gallery Plus, Inc.), 72 F.3d 1171, 1180 (3d Cir. 1996). Consequently, we reject the Trustee's flawed attempt to equate "possession" with "control."

Undaunted, the Trustee tries to attach decretory significance to the fact that the FRA received only $2,400,000 or so from the sale of the Lines (more than $30,000,000 less than the total of the loan balance, plus incurred interest and penalties), while the 2003 Investors received payment in full. The Trustee suggests that this fact shows that the debtor, not the FRA, had control over the sale proceeds. But this suggestion represents magical thinking: the debtor could never have sold the Lines, let alone decided how to distribute the sale proceeds, without the FRA's approval. That the FRA chose to structure the waterfall disbursements in a way that favored the 2003 Investors may well be

- 21 -

an indication that the 2003 Investors had some leverage; it is not, however, an indication that the debtor had control over the sale proceeds.

We recognize that the FRA's decision to divert the proceeds of the sale to less senior creditors may seem unusual, but the FRA is not a typical transacting party. Rather, the FRA is an executive agency of the United States, which employs its lending program to maintain and improve the nation's railroads. See 45 U.S.C. § 822. Here, it agreed to a loan modification that it deemed to be in the national interest; and in structuring that modification, it presumably determined that the national interest would be best served by distributing the sale proceeds in accordance with the waterfall provision. We have no reason to believe that it would have surrendered its security interest in the Lines otherwise. To permit the Trustee retroactively to unwind this transaction would simply second-guess the FRA and disturb the balance that it sought to strike without any principled basis for doing so.

In a last ditch attempt to salvage his complaint, the Trustee points to other allegations in the complaint that, in his view, make his claim plausible. He emphasizes, for instance, the complaint's allegations that the waterfall disbursements "consisted entirely of unencumbered assets" belonging to the debtor at the time of payment. The problem, though, is that the

Trustee gives too much weight to conclusory statements and rhetorical flourishes. Plausibility demands that a pleader offer more substantial stuff. See Iqbal, 556 U.S. at 678. As the Supreme Court has explained, "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Id. (quoting Twombly, 550 U.S. at 555). Nor will "bald assertion[s]" satisfy the plausibility standard. A.G. ex vel. Maddox, 732 F.3d at 80.

In this instance, the conclusory statements and rhetorical flourishes contained in the complaint are belied by the cold, hard facts. Under the plausibility standard, fairly applied, the complaint does not state a claim upon which relief can be granted.

Teetering on the brink of defeat, the Trustee scrambles to attain firmer footing by switching the subject. He contends that he should at least have been given leave to amend his complaint pursuant to Bankruptcy Rule 7015. This contention gains him no ground.

Bankruptcy Rule 7015 employs Rule 15 of the Federal Rules of Civil Procedure as the "mechanism for adjudicating motions to amend a pleading in the bankruptcy context." In re Curran, 855 F.3d at 27. Subject to the exceptions not pertinent here, Rule 15 authorizes amendment only by leave of court. See Fed. R. Civ. P. 15(a)(2). Though a "court should freely give leave when justice

- 23 -

so requires," id., it has discretion to deny such a request for reasons including "undue delay," "bad faith or dilatory motive," "undue prejudice," or "futility of amendment," Foman v. Davis, 371 U.S. 178, 182 (1962).  We review denial of leave to amend for abuse of that discretion.  See In re Curran, 855 F.3d at 28.

To begin, the Trustee requested leave to amend for the first time in the district court.  He never asked for any such largesse in the bankruptcy court.  Ordinarily, a party must "seek any relief that might fairly have been thought available" in the nisi prius court, on pain of waiver.  Beaulieu v. IRS, 865 F.2d 1351, 1352 (1st Cir. 1989) (Aldrich, J.); accord Vega-Rodriguez v. P.R. Tel. Co., 110 F.3d 174, 184 (1st Cir. 1997).  The Trustee fails to articulate any reason sufficient to warrant a departure from this prudential principle.

Even if we were disposed to overlook this waiver — and we are not — the Trustee has not identified any other or further factual allegations that could be set out in an amended complaint that would suffice to revivify his failed avoidance claim.  The terms of the Second Amendment are clear and, on this record, leave to amend would appear to be "an empty exercise." Vega-Rodriguez, 110 F.3d at 184.  Consequently, the district court neither lapsed into error nor abused its discretion in rejecting the Trustee's belated request for leave to amend his complaint.  See In re Curran, 855 F.3d at 28-29 (denying leave to amend as futile because

of plaintiff's failure to allege additional facts that would render claim plausible); <u>Coyne</u> v. <u>City of Somerville</u>, 972 F.2d 440, 446 (1st Cir. 1992) (similar).

**III. CONCLUSION**

We need go no further.  For the reasons elucidated above, the dismissal of the Trustee's complaint is

**Affirmed.**