# United States Court of Appeals
## For the First Circuit

No. 17-1436

IN RE: INSITE CORPORATION, INC.,

Debtor.

INSITE CORPORATION, INC.

Appellant,

v.

WALSH CONSTRUCTION COMPANY PUERTO RICO,

Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]
[Hon. Mildred Cabán-Flores, U.S. Bankruptcy Judge]

Before

Torruella, Lipez, and Barron,
Circuit Judges.

David Carrión-Baralt for appellant.
Paul T. DeVlieger, with whom DeVlieger Hilser P.C. was on
brief, for appellee.

October 5, 2018

**LIPEZ**, **Circuit Judge**.  The appellant in this case is a bankrupt subcontractor, Insite, which claims that a general contractor, Walsh, improperly withheld payments belonging to its bankruptcy estate.  Insite sought to recover the payments by initiating an adversary proceeding against Walsh in bankruptcy court in Puerto Rico.  The bankruptcy court found that the withheld payments were not property of Insite's estate, the district court affirmed, and Insite now appeals to us.

Applying the Supreme Court's decision in Pearlman v. Reliance Insurance Co., 371 U.S. 132, 141-42 (1962), we have held that, under Puerto Rico law, funds withheld by a general contractor to cure a subcontractor's default and to complete a subcontractor's work do not become property of the subcontractor, and hence are not part of the subcontractor's bankruptcy estate.  See Segovia Dev. Corp. v. Constructora Maza, Inc., 628 F.2d 724, 729-30 (1st Cir. 1980).  The bankruptcy court found that this well-established principle, known as the Pearlman doctrine, prevented Insite from gaining a property interest in the funds withheld by Walsh, and it accordingly granted summary judgment to Walsh.

Because we conclude that Insite had no right under the subcontract with Walsh to any of the funds it claims were withheld, we do not rely on the Pearlman doctrine.  In the unusual circumstances of this case, neither that doctrine nor the parties' contract answers the question that determines Insite's right to

- 2 -

payment: whether a defaulting subcontractor who has no contractual right to compensation is nonetheless entitled to an equitable recovery if the general contractor has benefited at the subcontractor's expense. In that scenario, the subcontractor's right to recovery, if any, must be determined by other principles of local law. Thus, although we agree with the bankruptcy and district courts that Insite is not due funds under its contract with Walsh, the courts still must consider whether Walsh was benefited by Insite's post-default performance in such a way that Insite has an equitable claim under Puerto Rico law. We therefore vacate the judgment and remand to allow the bankruptcy court to address that issue in the first instance.

## I.

### A. Factual & Procedural Background

In September 2010, the Department of Veterans Affairs awarded appellee Walsh Construction Company Puerto Rico ("Walsh") a contract to build an addition to a VA facility in San Juan, Puerto Rico. Two months later, Walsh subcontracted with appellant Insite Corporation, Inc. ("Insite") for certain concrete and masonry work. Insite in turn contracted with a number of sub-subcontractors and suppliers (collectively, its "suppliers") and began its work on the job site. The terms of the Walsh-Insite contract entitled the latter to periodic progress payments, subject to certain conditions. Insite regularly applied for, and

Walsh regularly satisfied, such payments through the month of November 2011.

More precisely, the last progress payment issued by Walsh corresponded to work performed by Insite through November 21, 2011. Insite would later apply for three other progress payments totaling $591,953: $179,897 for work performed from November 22 to December 26, 2011; $70,750 for work performed from December 27, 2011 through January 22, 2012; and $341,306 for work performed from January 23 through March 7, 2012. Walsh did not approve these payment applications for reasons that we shall explain.

On the morning of December 30, 2011, Walsh hand-delivered Insite a letter titled "Notice of Default," accusing Insite of materially breaching the parties' subcontract by failing to pay its suppliers. Specifically, Walsh asserted that a check issued by Insite to pay a supplier for work performed in October 2011 was rejected for insufficient funds, and that Insite had balances overdue by 60 to 120 days with two other suppliers. Consistent with the terms of the parties' contract, the letter provided Insite 72 hours to remedy its default, and demanded assurance that Insite intended and was able to perform the balance of its contracted work.

That evening, at 5:49 p.m., Insite filed for Chapter 11 bankruptcy. Insite subsequently notified Walsh of this

development and assured Walsh that the protection afforded by federal bankruptcy law would allow it to continue executing the subcontract. Walsh responded with a letter contesting the adequacy of Insite's assurance and accusing Insite of failing to timely pay two more suppliers.

Meanwhile, Walsh notified Insite's surety, United Surety & Indemnity Company ("USIC"), that Insite was in default of the subcontract. USIC, however, refused to perform on its bond, asserting that it had no obligation to perform until Walsh formally terminated its subcontract with Insite. Though Walsh had accused Insite of defaulting on the subcontract, it was unable to terminate the agreement before Insite entered bankruptcy. And, once Insite filed for bankruptcy, Walsh could not terminate the contract without the bankruptcy court's approval. See, e.g., Computer Commc'ns Inc. v. Codex Corp. (In re Computer Commc'ns), 824 F.2d 725, 728 (9th Cir. 1987) (holding that defendant was required to obtain bankruptcy court's permission before terminating contract with debtor).[1]

With Walsh unable to terminate Insite, and USIC refusing to perform on its bond, Insite continued to execute at least some work on the job site after it filed for bankruptcy. The value of

---

[1] Walsh eventually moved to terminate the contract in both June and September 2012, but the court denied the motions in December 2012.

the work performed by Insite during this time, and in the month preceding its bankruptcy filing, is unclear. Taken at face value, the progress payment applications submitted by Insite for its work from November 22, 2011 to March 7, 2012 suggest that Insite performed $591,953 worth of work for which it was not paid. However, Walsh was not satisfied with Insite's performance during this time. Walsh sent a number of letters to Insite accusing it of repeatedly defaulting on the contract and of failing to timely prosecute its work. Furthermore, to keep Insite's suppliers working on the project, Walsh issued $63,927.15 in jointly payable checks to Insite and its suppliers. Walsh contends that these checks were intended to be deposited by the suppliers, but that Insite appropriated the checks for its own purposes.

On February 29, 2012, Insite, USIC, and one of Insite's creditors sought the bankruptcy court's approval of a stipulation allowing Insite to "assume" its contracts with Walsh and Insite's suppliers.[2] The bankruptcy court approved the stipulation on March

---

[2] In a Chapter 11 proceeding, the debtor (or its trustee) may "assume or reject an executory contract . . . at any time before the confirmation of a [reorganization] plan," subject to the bankruptcy court's approval. 11 U.S.C. § 365(d)(2); id. § 365(a). "This latitude allows the debtor in possession an opportunity to determine which of the prepetition executory contracts are beneficial to the estate and which should be assumed or rejected." Mason v. FBI Distrib. Corp. (In re FBI Distrib. Corp.), 330 F.3d 36, 42 (1st Cir. 2003). An executory contract remains in effect while the debtor is deciding whether to assume or reject it, as it cannot be terminated without the bankruptcy court's consent. See In re Computer Commc'ns, 824 F.2d at 728-31. If the bankruptcy

1, and then formally granted the underlying motions to assume the contracts on March 29.[3]  Following the court's March 1 approval of the stipulation, Insite notified Walsh that its cash flow situation was "critical," and declared it "imperative that Insite gets payment for the work performed during the months of December 2011 and January 2012."  Insite's letter closed by informing Walsh that Insite would "be forced to suspend work until proper funding is available" if it did not receive payment from Walsh by March 9.

Walsh responded with a letter on March 9, refusing to make any payments to Insite.  According to a spreadsheet attached to the letter, Walsh issued direct payments to some of Insite's suppliers, Insite continued to carry past-due balances with other suppliers, and Walsh incurred certain other expenses related to Insite's defaults.  As a result, Walsh's "preliminary analysis"

---

court approves an assumption, the debtor "accepts both the burdens and the benefits of the bargain."  Eagle Ins. Co. v. BankVest Capital Corp. (In re BankVest Capital Corp.), 360 F.3d 291, 296 (1st Cir. 2004).

[3] The record reflects some confusion between the parties as to the date on which Insite legally assumed the parties' contract. There are three possible dates of assumption: (a) when the bankruptcy court approved the stipulation on March 1, 2012; (b) when the bankruptcy court approved the underlying motion to assume on March 29; or (c) when the bankruptcy court's March 29 order "became final and firm" on April 12.  The precise date of assumption makes no difference to our decision, and we see no need to decide the issue.  However, in the interest of simplicity, we will refer to the date of assumption as March 29.  We also note that neither party challenges the bankruptcy court's decision to allow Insite to assume the contract.

showed that "Insite's liabilities on the project exceed the amount otherwise due Insite on the project by over $180,000."  However, this "preliminary" analysis did not include Insite's $341,306 payment application for work performed from January 23 through March 7, which Insite did not submit until March 19.[4]

Insite did not perform any work after it received Walsh's March 9 letter.  Accordingly, on March 14, Walsh notified Insite of its intent to:

> supply such numbers of workers and quantity of materials, equipment and other facilities as Walsh deems necessary for the completion of Insite's Subcontract work; contract with one or more additional contractors to perform such part of Insite's Subcontract work . . . and/or withhold payment of any moneys due Insite pending corrective action to the extent required by and to the satisfaction of Walsh and the Architect/Engineer.

Believing that Walsh owed it $591,953 in unpaid progress payments, Insite filed an adversary complaint in bankruptcy court on May 29, 2012.[5]  The complaint asserted, inter alia, that the unpaid progress payments were property of the bankruptcy estate; that Walsh violated the Bankruptcy Code's automatic stay, 11 U.S.C.

---

[4] In the proceedings below, the parties also disputed whether Walsh's preliminary analysis accurately reflected the balance between the parties at the time of the calculation.  As that issue has not been briefed on appeal, we express no opinion on the matter.

[5] Insite actually requested $586,600 in its complaint, but its subsequent filings in this case have stated that Walsh owes it $591,953.  This discrepancy is immaterial to our decision.

§ 362, by withholding the payments; and that Walsh breached the subcontract. Insite subsequently filed a motion for summary judgment in September 2013. The court denied the motion in January 2015, finding genuine issues of material fact about: (a) the amount of monies withheld by Walsh; (b) the amount of work performed by Insite; and (c) whether Insite's suppliers were paid, and if so, by whom.

Walsh then filed a motion for summary judgment which the bankruptcy court granted in October 2015. The court explained that Insite's claims were all premised on the threshold proposition that the unpaid progress payments were property of the estate. However, applying the Pearlman doctrine, the court found it "well settled . . . that contract funds in a construction project do not become property of the estate until the debtor completes the project and fully complies with the payment obligations to the suppliers and laborers." Since it was undisputed that Insite "never cured [its] arrears, even upon assumption of the contract with Walsh," Insite "never became entitled to receive any funds." The court found that Insite's failure to cure deprived it of any property interest whatsoever in the funds at issue, and Walsh thus "did not violate the automatic stay by withholding payment to [Insite]." The bankruptcy court denied Insite's motion for reconsideration, reiterating that "Insite never became entitled to any payment under the subcontract." The district court affirmed

the bankruptcy court on substantially the same reasoning, and this appeal followed.

**II.**

**A. Legal Principles**

The filing of a bankruptcy petition creates an estate comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case," with some exceptions not applicable here. 11 U.S.C. § 541(a)(1). The Bankruptcy Code then protects the property of the estate by imposing an "automatic stay" that prevents creditors from taking certain actions adverse to the estate's property interests. Id. § 362; see also Jamo v. Katahdin Fed. Credit Union (In re Jamo), 283 F.3d 392, 398 (1st Cir. 2002).

When a debtor believes that particular property belongs to its estate, or that a person is violating the automatic stay, it may file an adversary complaint asking the bankruptcy court to resolve the matter. See Fed. R. Bankr. P. 7001; McMullen v. Sevigny (In re McMullen), 386 F.3d 320, 324 (1st Cir. 2004); City of Springfield v. Ostrander (In re LAN Tamers, Inc.), 329 F.3d 204, 208-09 (1st Cir. 2003). The bankruptcy court's judgment can be appealed to either the district court or the bankruptcy appellate panel, at the parties' discretion. See 28 U.S.C. § 158;[6]

---

[6] Section 158 requires the circuit courts to "establish a bankruptcy appellate panel service composed of bankruptcy judges

Vázquez Laboy v. Doral Mortg. Corp. (In re Vazquez Laboy), 647 F.3d 367, 373 (1st Cir. 2011). Any subsequent appeal comes to this court. We "concentrate on the bankruptcy court's decision, reviewing its findings of fact for clear error and its conclusions of law de novo," and ceding "no special deference to the intermediate decision." Stornawaye Fin. Corp. v. Hill (In re Hill), 562 F.3d 29, 32 (1st Cir. 2009).

In assessing whether property belongs to a bankruptcy estate, "we first must determine the scope of the debtor's property rights under state law." Keach v. Wheeling & Lake Erie Ry. (In re Montreal, Me. & Atl. Ry.), 888 F.3d 1, 7 (1st Cir. 2018). If the debtor has a property interest under state law, we "then look to federal law, which 'dictates to what extent that interest is property of the estate.'" Id. (quoting Rent-A-Ctr. E., Inc. v.

_____

of the districts in the circuit" unless a circuit's judicial council finds that "there are insufficient judicial resources available in the circuit" or that "establishment of such service would result in undue delay or increased cost to parties." 28 U.S.C. § 158(b)(1). Five circuits, including the First Circuit, have established bankruptcy appellate panels. See 8 Hon. William L. Norton Jr., Norton Bankruptcy Law and Practice § 170:6 (3d ed. July 2018 update). Section 158 makes the panels the default destinations for bankruptcy appeals, unless "(A) the appellant elects at the time of filing the appeal; or (B) any other party elects, not later than 30 days after service of notice of the appeal; to have such appeal heard by the district court." 28 U.S.C. § 158(c)(1). In this case, Insite appealed to the bankruptcy appellate panel and Walsh elected to have the appeal heard by the district court.

Leonard (In re WEB2B Payment Sols., Inc.), 815 F.3d 400, 405 (8th Cir. 2016)).

## B. The Contract

As an initial matter, we can easily discard Insite's contention that Walsh, rather than Insite, materially breached the parties' agreement. In its bankruptcy court filings, Insite admitted that it "had failed to make the contractually mandated payments to its subcontractors and suppliers," and "was, in fact, in default of its payment obligations." Furthermore, Insite conceded that "as of December 30, 2011" -- the date on which Walsh delivered to Insite its original notice of default and on which Insite filed for bankruptcy -- "Insite had been fully paid for all final Payment Applications which Insite submitted to Walsh."[7] Nonetheless, Insite argues on appeal that its failure to pay suppliers was not a material breach of the contract. And, since its breach was not material, Insite believes that Puerto Rico law required Walsh to continue issuing progress payments.

---

[7] In light of this admission, the district court found that Insite's insistence that Walsh was liable for the $179,897 progress payment application it submitted for work performed from November 22 through December 26 was "disingenuous." However, the record suggests that as of December 30, the $179,897 progress payment application was not yet due and payable. It thus appears, subject to further evaluation by the bankruptcy court, that Insite's admission is not inconsistent with its reliance on the progress payment application.

- 12 -

Insite's argument is squarely foreclosed by Section 8.1 of the subcontract, which categorizes the failure to pay subcontractors and suppliers as a material breach. Specifically, that section provides that if Insite "refuses or fails to supply enough properly skilled workers, proper materials, or maintain the Schedule of Work, or it fails to make prompt payment for its workers, subcontractors or suppliers, disregards Laws . . . or otherwise materially breaches a provision of this Agreement," Walsh shall have certain rights to recourse. (Emphases added.) The use of the phrase "otherwise materially breaches" in this provision is conclusive, showing that the parties intended the list of refusals or failures preceding it to be material breaches. Cf. P.R. Laws Ann. tit. 31 § 3471 ("If the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed."). Hence, Insite's admitted failure to timely pay its suppliers was a material breach pursuant to Section 8.1 of the subcontract.[8]

Once Insite defaulted on its obligations, at least three provisions of the subcontract allowed Walsh to immediately begin withholding progress payments from Insite. Section 3.6 expressly

---

[8] Since we conclude that Insite's breach was material, we do not need to decide whether Puerto Rico law would have required Walsh to continue issuing progress payments in the face of a non-material breach.

conditioned Insite's entitlement to progress payments on its compliance with the subcontract.

> Time of Payment. <u>If Subcontractor is in compliance with this Subcontract</u> and if, and only if, Owner [first] pays Contractor . . . Progress Payments shall be due to Subcontractor no later than ten (10) days after receipt of payment from Owner by Contractor <u>provided Subcontractor remains in compliance with the terms of this Agreement</u>.

(Emphases added.) Section 3.11 of the subcontract allowed Walsh to intervene if it had reason to suspect that Insite was not satisfying its labor and supplier obligations:

> Subcontractor Payment Failure. In the event Contractor has reason to believe that labor, material or other obligations incurred in the performance of the Subcontractor's Work are not being paid, the Contractor may take <u>any steps Contractor deems necessary to insure that such obligations are paid</u> including, but not limited to, issuance of checks jointly to Subcontractor and the person to whom Subcontractor owes an obligation, and direct payment of labor . . . and Subcontractor's subcontractors and suppliers . . . .

(Emphasis added.) And, Section 3.12 gave Walsh the right to "withhold amounts otherwise due under this Agreement . . . to cover [Walsh's] reasonable estimate of any costs or liability [it] has incurred or may incur for which [Insite] may be responsible."

Once Insite failed to timely cure its defaults, Walsh became entitled to take a number of additional remedial actions at Insite's expense. Section 8.1 of the subcontract provided Insite

- 14 -

with 72 hours to "commence and continue satisfactory correction of [its] default[s]."[9]  After 72 hours, Section 8.1 allowed Walsh to

> (i) supply . . . workers and . . . materials, equipment and other facilities as the Contractor deems necessary for the completion of Subcontractor's Work . . . and charge the cost thereof to the Subcontractor . . . (ii) contract with . . . additional contractors to perform . . . the Subcontractor's Work . . . and charge the cost thereof to the Subcontractor; and/or (iii) withhold payment of any moneys due the Subcontractor pending corrective action . . . .

As a result of these provisions, when Walsh accused Insite of defaulting on the contract on December 30, 2011, Walsh was entitled to immediately begin withholding progress payments from Insite.  It could use the withheld funds to pay Insite's suppliers and laborers directly, and could apply the funds to cover costs and liabilities reasonably related to Insite's defaults.  Once Insite failed to timely cure its defaults, Walsh could additionally invoke the remedies found at Section 8.1 of the subcontract.  Thus, the subcontract gave Walsh the right to use the progress payments to cure Insite's defaults and complete Insite's work.

---

[9] Walsh believes, and Insite does not disagree, that Insite's filing of its bankruptcy petition paused this 72-hour window until Insite assumed the subcontract on March 29, 2012.  Walsh accordingly calculates the 72 hours as extending until April 1, 2012.  It is undisputed that at that time Insite had not performed any work for over three weeks, and had not cured its defaults.

## C. The Pearlman Doctrine

As a general matter, it has been widely held that a defaulting subcontractor does not have a property interest in funds withheld by a general contractor to cover cure and completion costs. This principle derives from the Supreme Court's opinion in Pearlman v. Reliance Insurance Co., a case involving the competing claims of a surety and a contractor's bankruptcy trustee to funds withheld by a project owner. 371 U.S. 132 (1962). The owner in Pearlman had accumulated $87,737 in retainages by the time its contractor defaulted. Id. at 134. A surety stepped in and spent over $350,000 to discharge the contractor's debts for labor and materials. Id. The surety and the contractor's bankruptcy trustee both claimed ownership of the $87,737 in withheld funds.

The Pearlman Court held that the surety owned the funds. Importantly for our purposes, the Court's holding was based on its conclusion that the project owner had a right to use the retainages to satisfy the defaulting contractor's debts to its laborers. Id. at 141. Once the surety stepped into the owner's shoes and fulfilled its obligation to cover the subcontractor's debts, the surety became subrogated to the owner's right to the funds "to the extent necessary to reimburse it" for its costs. Id. Since the surety had "paid out more than the amount of the [withheld] fund, it ha[d] a right to all of it," and the fund thus did not become

property of the defaulting contractor's bankruptcy estate.  Id. at 141-42.

In a trio of cases building on Pearlman, we have made clear that the Pearlman doctrine applies regardless of whether the defaulting party is a general contractor or (as here) a subcontractor, and regardless of whether the withheld funds are retainages or (as here) unpaid progress payments.  See Framingham Trust Co. v. Gould-Nat'l Batteries, Inc., 427 F.2d 856 (1st Cir. 1970); Nat'l Shawmut Bank of Bos. v. New Amsterdam Cas. Co., 411 F.2d 843, 844 (1st Cir. 1969); Am. Fire & Cas. Co. v. First Nat'l City Bank of N.Y., 411 F.2d 755, 757 (1st Cir. 1969).  We subsequently established that Puerto Rico law governing the ownership of withheld funds aligns with the Pearlman doctrine. See Segovia Dev. Corp. v. Constructora Maza, Inc., 628 F.2d 724, 725 (1st Cir. 1980).  In Segovia Development, the contractor had defaulted and filed for bankruptcy, and a surety stepped in and "expended funds greatly in excess" of the $423,630 withheld by the project owner.  Id. at 726.  We explained that under the law of Puerto Rico, the surety was "subrogated to any rights which the owner . . . has against [the contractor]," including the owner's rights to apply the withheld funds to its cure and completion costs.  Id.  The funds thus belonged to the surety rather than to the defaulting contractor's bankruptcy estate.  Id. at 725, 730.

The bankruptcy court granted summary judgment to Walsh because it found that, under the Pearlman doctrine, Insite had no property interest in the funds at issue.[10] The court made this finding despite Insite's contention that the funds withheld by Walsh exceeded Walsh's cure and completion costs and that it was entitled to the excess amount. As we shall explain, the court properly rejected Insite's entitlement to the funds at issue insofar as its claim was premised on the parties' contract. However, the court neither determined as a factual matter whether Walsh benefited from Insite's post-default performance nor whether Puerto Rico law would provide Insite a non-contractual property interest in any such funds. Absent one or both of those determinations, the grant of summary judgment for Walsh was premature.

## III.

Insite has consistently maintained that substantial withheld funds remain after cure and completion expenses are deducted, and it claims entitlement to the difference between the total withheld -- i.e., the payments that would have been due Insite for its work under the contract if Insite had not defaulted -- and the amount attributable to the cost of remedying the default. Otherwise, Insite complains, Walsh would receive a

---

[10] The district court's opinion followed the same line of reasoning.

windfall. Walsh insists that there is no "excess" and that, in any event, Insite's bankruptcy estate has no claim to any such funds.

The bankruptcy court understandably bypassed both the factual and legal questions pertinent to Insite's entitlement to any excess funds. Although Insite broadly claims a right to payment for the work it performed, its briefing has not clearly distinguished between its contractual rights and any equitable or other bases for its claim. Moreover, this case involves a complex set of facts that are not easily untangled. With the bankruptcy filing preventing Walsh from terminating the contract, Insite continued to work on the project for more than two months despite Walsh's evident dissatisfaction with its performance. The "excess" that Insite claims appears largely attributable to that seemingly unusual period of ongoing work.

Thus, while Insite could have more clearly articulated the basis for its claim, we are reluctant to affirm summary judgment for Walsh without careful review of its entitlement to funds attributable to the work that Insite performed following its bankruptcy filing and that, if not belonging to Walsh, might be available to Insite's creditors. On remand, the bankruptcy court will have the opportunity to answer the questions that remain. First, however, we explain why the court correctly rejected Insite's reliance on the contract.

## A. Insite's Rights under the Contract

In December 2011, when Walsh notified Insite that it was in default of its contractual obligations, Insite was carrying past-due balances with three of its suppliers totaling $45,832.66. As Insite continued to work on the job site during the next two months, it also continued to accumulate liabilities to its suppliers. As the bankruptcy court observed, it is undisputed that Insite "never cured [its] arrears." Meanwhile, Insite continued to submit applications for progress payments, with the total amount requested eventually reaching $591,953.

The bankruptcy court reasoned that Insite's failure to cure its initial default deprived it of any property interest whatsoever in the withheld funds, including excess funds. As a matter of contract law, the bankruptcy court was correct. Under standard principles governing the interpretation of contracts for services, including for construction, the service provider is due nothing until the full project is complete -- unless the contract itself provides for a different arrangement. See Restatement (Second) of Contracts § 234 & id. cmt. f[11]; see also Constructora

---

[11] Comment f provides the following illustration of this principle:

> A contracts to do the concrete work on a building being constructed by B for $10 a cubic yard. In the absence of language or circumstances indicating the contrary, payment by B is not due until A has finished the concrete work.

- 20 -

Bauzá v. García López, 129 D.P.R. 579, 1991 P.R.-Eng. 735,859, P.R. Offic. Trans. (1991) (noting that, "if one of the parties [in a construction contract] does not fulfill his obligation, the other party may consider the contract dissolved" (citing 31 P.R. Laws Ann. § 3052)). The Walsh-Insite contract did specify a different arrangement in the multiple provisions governing progress payments, reflecting the parties' understanding that Insite would need partial payment as the project moved forward so that it could remain current with its subcontractors and suppliers. Two of the progress-payment provisions are of particular significance to Insite's claim here.

First, section 3.2 states that "the Subcontractor's progress payment application shall be submitted to the Contractor in a form and with content and documentation acceptable to Contractor and Owner." The approved form, contained in the record, requires Insite to certify that "the work covered by this application for payment has been completed in accordance with the contract documents, that all amounts have been paid by [Insite] for work for which previous Certificates for payment were issued and payments received from [Walsh], and that current payment shown herein is due." (Emphasis added.) Second, section 3.6, which is labeled "Time of Payment," conditions the progress payments on the recipient's compliance with the contract. It provides that

payments will be made to Insite according to the specified schedule "[i]f Subcontractor is in compliance with this Subcontract."

These provisions are problematic for Insite because both, in effect, require Insite to be up-to-date in paying its suppliers and subcontractors, and Insite admits that it was not. Insite acknowledges that, starting in at least November of 2011, it did not pay all amounts due to its suppliers for work that was the basis for progress payments previously made by Walsh. Unable to certify that it had paid those debts, Insite could not submit a proper application for progress payments. And, hence, the applications for the progress payments at issue here could not satisfy the section 3.6 contingency requiring Insite to be "in compliance with this Subcontract." Having failed to comply with the contract's requirements for receipt of progress payments, Insite had no right to payment under the contract until -- under ordinary contract principles -- it had completed the job. See Restatement (Second) of Contracts § 234. Insite never fulfilled that prerequisite.

## B. Non-Contractual Recovery

As noted above, neither the bankruptcy court nor the district court considered whether Insite would have an alternative basis under Puerto Rico law for payment of any amount that, absent its default, would have been due under the contract. In other words, the question remains whether Insite may have an equitable

claim against Walsh in the unusual circumstances of this case. See Restatement (Second) of Contracts § 240 (noting that, in some cases, a party's material breach may nonetheless leave open the possibility of "restitution in accordance with the policy favoring avoidance of unjust enrichment" (citing §§ 370-77)); see also U.S. Steel v. M. DeMatteo Const. Co., 315 F.3d 43, 49-50 (1st Cir. 2002) (noting that, under Massachusetts law, a subcontractor "who in good faith substantially performs a contract may recover in quantum meruit" (quoting J.A. Sullivan Corp. v. Commonwealth, 494 N.E. 2d 374, 378 (Mass. 1986)).

Because the bankruptcy court here granted summary judgment based on the Pearlman doctrine without addressing the parties' contentions regarding the value of Insite's post-default performance and the amount of Walsh's costs, those factual issues remain undeveloped. Nor did the court address whether Insite, as a defaulting subcontractor, would have a "legal or equitable" property interest under Puerto Rico law if the court found that the value of Insite's performance exceeded Walsh's costs. 11 U.S.C. § 541(a)(1).

Accordingly, we vacate the bankruptcy court's judgment and remand for further proceedings to resolve the competing claims of the parties about money owed or not owed. See First Indem. of Am. Ins. Co. v. Modular Structures, Inc. (In re Modular Structures, Inc.), 27 F.3d 72, 80 (3d Cir. 1994) (remanding under similar

circumstances "to determine if any other factors might establish that any part of the funds were 'owed' to [the defaulting contractor]"). If the court finds that Walsh benefited at Insite's expense, the court "first must determine the scope of [Insite's] property rights" under state law, if any, in the value of its performance. In re Montreal, Me. & Atl. Ry., 888 F.3d at 7. If Insite has a property interest under state law, the bankruptcy court should "then look to federal law, which 'dictates to what extent that interest is property of the estate.'" Id. (quoting In re WEB2B Payment Sols., Inc., 815 F.3d at 405).[12]

**IV.**

For the reasons stated, we vacate the judgment of the district court and remand the matter to the district court with directions to vacate the bankruptcy court's judgment and remand the matter to the bankruptcy court for further proceedings consistent with this opinion. The parties shall bear their own costs on appeal.

**So ordered.**

---

[12] As a final matter, the bankruptcy court correctly determined that the letters sent from Walsh to Insite accusing the latter of being in default did not violate the automatic stay. See Am-Haul Carting, Inc. v. Contractors Cas. and Sur. Co., 33 F. Supp. 2d 235, 242 (S.D.N.Y. 1998) (finding that general contractor's notice of default to subcontractor, in and of itself, did not violate the automatic stay). The court astutely explained that, unlike a case in which a creditor accuses a bankrupt debtor of defaulting in order to collect a debt, here, the debtor (Insite) was attempting to collect from Walsh. In this context, Walsh's accusations of default were defensive, and were not attempts to obtain property of the estate in violation of the automatic stay.